**In re INTEGRATED RESOURCES REAL ESTATE LIMITED PARTNERSHIPS SECURITIES LITIGATION.**

MDL No. 897.
No. MISC. 21–61 (RWS).

United States District Court,
S.D. New York.

Jan. 8, 1993.

As Amended Feb. 11, 1993.

Anderson Kill Olick & Oshinsky, P.C. (Steven M. Pesner, Robert H. Pees, David M. Zensky, of counsel), Camhy Karlinsky & Stein (Kenneth A. Lapatine, Mark H. Budoff, of counsel), Townley & Updike (Jonathan M. Herman, of counsel), New York City, for defendants.

Arnold & Porter (Stephen M. Sacks, Larry Rector, of counsel), Washington, DC, for defendant Deloitte & Touche.

Arent Fox McGarrahan & Heard (Ronald Weiner, of counsel), New York City, for defendant GA Partners Inc.

Cahill Gordon & Reindel (Susan Buckley, Thomas J. Kavaler, of counsel), New York City, for defendant Prudential Bache Securities, Inc.

Carter, Ledyard & Milburn (Beth D. Jacob, Jonathan F. Mack, of counsel), New York City, for defendant Landauer Associates.

Hunton & Williams (Christopher M. Mason, Scott J. McKay Wolas, Joseph J. Salturelli, of counsel), New York City, for defendant Mfrs. Hanover Trust.

Jones, Day, Reavis & Pogue (Elaine H. Mandelbaum, Jeffrey S. Tolk, of counsel), New York City, for defendant Cushman & Wakefield of Pennsylvania, Inc.

Kornstein Veisz & Wexler (David S. Douglas, Howard Levi, of counsel), New York City, for Ameritrust Co. Nat. Assoc., First Interstate Bank of California, Morgan Guar. Trust Co. of New York, Sec. Pacific Nat. Bank, Signet Bank/Virginia.

Robert J. Mannix, Deputy General Counsel, Deloitte & Touche, New York City.

Morrison & Foerster (Carroll Neesemann, of counsel), New York City, for defendant Kidder Peabody & Co., Inc.

Proskauer Rose Goetz & Mendelsohn (David I. Goldblatt, Lawrence P. Eagel, of counsel), New York City, for Richard H. Ader and Alan H. Weiner.

Ross & Hardies (Peter I. Livingston, Michelle J. d'Arcambal, of counsel), New York City, for defendants Hunter Pub. Co., Inc., Elliot Stein, Jr., I. Martin Pompadur.

Beigel & Sandler (Bijan Amini, Elizabeth Toll, Marilyn Neiman, Alexander T. Moore, of counsel), New York City, for plaintiffs.

Martin Mushkin, New York City, Waite, Schneider, Bayless & Chesley Co., L.P.A. (Stanley M. Chesley, Terrence L. Goodman, of counsel), Cincinnati, OH, for plaintiffs in Ellingson v. Kanzar Assocs.

OPINION

SWEET, District Judge.

The Judicial Panel on Multidistrict Litigation ("MDL") consolidated and transferred to this Court on October 10, 1991, a number of actions arising out of the demise of partnerships affiliated with Integrated Resources, Inc. ("Integrated"), which filed for relief under chapter 11 of the bankruptcy code, 11 U.S.C. §§ 101, et seq., in 1990. See In re Integrated Resources, Inc., 135 B.R. 746, 748 (Bankr.S.D.N.Y.1992). Since the transfer of the original actions, several others have been filed in the Southern District of New York or transferred by the Multidistrict Panel to this Court and consolidated with these proceedings ("Later Filed Actions").

In general, the Plaintiffs in each of these actions bought limited partnership interests in ventures sponsored by Integrated or an entity associated with Integrated. The ventures were investment vehicles which bought, owned, operated, and leased residential and commercial real estate and equipment. The offer and sale of these interests was conducted in compliance with the requirements of Regulation D ("Reg. D"), Rules 501–08, 17 C.R.F. 230.501–230.508, of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77a, et seq., thereby exempting the transactions from the registration requirements of the 1933 Act. Since these transactions are not registered with the Securities and Exchange Commission, the 1933 Act limits purchasers to those who qualify as "accredited investors."

To qualify as a Reg. D accredited investor, a "natural person" must have "an individual net worth, or joint net worth with that person's spouse, at the time of his purchase [in excess of] $1,000,000"; or he must have:

had an individual income in excess of $200,000 in each of the two most recent years or joint income with the person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

Rule 501(a)(5) & (6). A trust qualifies for accredited-investor status if it has "total assets in excess of $5,000,000, not formed for

the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person ...," Rule 501(a)(7), to wit, one who "has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment ...," Rule 506(b)(2)(ii).

■ The purpose of these requirements is to facilitate and expedite specially designed offerings, while at the same time offsetting the danger posed by the lack of SEC scrutiny of the offer and sale by precluding those from participating in the offering who are inexperienced purchasers of securities and unable to afford professional advice regarding the merits and risks of purchasing the offered securities. Each of the investors in the Integrated partnerships was required to represent in writing that he qualified for Reg. D accredited-investor status and that he met the additional financial criteria set forth in the "Who May Invest" section of the confidential private placement memorandum ("PPM") issued for each partnership.

The investors were also warned in the respective partnership PPMs of various financial risks involved with each partnership investment. The following statement from the first paragraph of the Clovine Associates Limited Partnership PPM is typical:

> The tax consequences of an investment in the Partnership, the absence of Cash Flow from such investment for at least the first four years of the operation of the Partnership and the illiquidity of such investment make the purchase of Interests suitable only for investors who have substantial net worth and substantial taxable income, and an Interest should be purchased only as a long-term investment.

Clovine PPM at 1.

Additionally, each PPM contained a section entitled "Risk Factors," in which the various risk factors of the investment were explicated at length, including, for example, restrictions on transferability and the possible lack of a market for the investment interests; the possible unavailability of tax benefits and changes in the tax law; risks arising from the terms and conditions of purchase money notes, mortgages, and leases; the possible inability to refinance the project; the possible lack of available sources of funds for the operating partnership; risks arising from leveraged financing and the ownership of the specific property; the possible inability to sell the project; and the possible adverse effects of technological developments in competing equipment.

The limited partnerships were highly leveraged, and the Plaintiffs allege they were promised considerable tax savings through debt financing and, after the initial debt was paid off, considerable profits from rental income from the buildings and equipment. The Plaintiffs further allege that the investments had no prospects for success from their inception and served no other economic purpose than to provide the Defendants with millions of dollars of profit in sales proceeds, fees, and other commissions.

On February 3, 1992, this Court signed "Pre-Trial Order No. 1" ("Pre-Trial Order") which, among other things, established an initial motion and discovery schedule for all actions subject to the MDL Order. The Pre-Trial Order created four separate global motion categories: (I) statutes of limitations governing the federal securities claims ("Global Motion I"), (II) the legal sufficiency of the federal securities claims ("Global Motion II"), (III) the legal sufficiency of the federal RICO claims ("Global Motion III"), and (IV) all Global Motion I, II, III motions applicable to the Later Filed Actions ("Global Motion IV"). The Pre-Trial Order also consolidated the briefing and hearing schedules for Global Motions I and II and Global Motions III and IV.

The actions subject to the present motion are:

> *Byrne v. Research Triangle Associates Limited Partnership*, 91 Civ. 6966 ("*Research Triangle*") (filed January 3, 1991 in the Arizona District, Phoenix Division);

> *Reagan v. 600 Grant Street Associates Limited Partnership*, 91 Civ. 5498 ("*600 Grant Street/Reagan*") (filed April 12, 1991 in the Central District of California);

> *Schoonmaker Homes v. 600 Grant Street Associates Limited Partnership*, 91 Civ. 8528 ("*600 Grant Street/Schoonmaker*")

(filed December 18, 1991 in the Southern District of New York);

*Standefer v. Clovine Associates Limited Partnership,* 91 Civ. 6968 (*"Clovine/Standefer"*) (filed April 9, 1991, in the Southern District of Ohio, Western Division);

*Ellingson v. Kanzar Associates,* 91 Civ. 6967 (*"Clovine/Ellingson"*) (filed March 14, 1991, in the Southern District of Ohio, Western Division);

*Baird v. EVP Fourth Corp.,* 91 Civ. 1063 (*"West Palm/Baird"*) (filed February 12, 1991, in the Southern District of New York);

*Coleman v. EVP Fourth Corp.,* 91 Civ. 0678 (*"West Palm/Coleman"*) (filed January 23, 1991, in the Southern District of New York);

*Coolspring Dental Clinic v. EVP Seventh Avenue Corp.,* 91 Civ. 6905 (*"Rittenhouse"*) (filed October 15, 1991, in the Southern District of New York);

*Martin v. EVP Second Corp.,* 90 Civ. 7074 (*"Lenox Towers"*) (filed November 2, 1990, in the Southern District of New York; dismissed with leave to replead to add additional plaintiffs by this Court on August 26, 1992);

*Gorman v. Sevzar Associates,* 90 Civ. 6979 (*"Southern Inns"*) (filed October 19, 1990 in the Southern District of New York);

*Greene's Ready Mixed Concrete Co. v. Fillmore Pacific Associates Limited Partnership,* 91 Civ. 0978 (*"Fillmore/Greene's"*) (filed February 8, 1991, in the Southern District of New York);

*Enviro Corp. v. Fillmore Pacific Associates Limited Partnership,* 91 Civ. 1625 (*"Fillmore/Enviro"*) (filed March 7, 1991, in the Southern District of New York);

*White v. Hunter Publishing Limited Partnership,* 91 Civ. 2232 (*"Hunter Publishing"*) (filed April 1, 1991, in the Southern District of New York);

*Christian v. Integrated MR Limited Partnership,* 91 Civ. 6003 (*"Intermobile"*) (filed September 5, 1991, in the Southern District of New York).

The present motions do not apply to any of the Later Filed Actions or to *Barron v. Miami Executive Towers Assocs. Ltd. Partnership,* 89 Civ. 8569 (RWS) (filed December 18, 1989, in the Southern District of New York), or to *Rabin v. Fivzar Assocs.,* 90 Civ. 4869 (RWS) (filed July 23, 1990, in the Southern District of New York). Nevertheless, the parties should assume that general principles set forth below will be applied to those actions in accordance with Global Motion IV.

Additionally, the Pre-Trial Order stayed the production of documents to the Plaintiffs by various parties pending the disposition of the Global Motions.[1] The Pre-Trial Order also stayed the depositions of parties, except as to the Plaintiffs' deposition of Landauer Associates, Inc., in *Clovine/Ellingson,* pending the disposition of the Global Motions and the completion of document discovery.

Pursuant to the schedule established in the Pre-Trial Order, as amended, the "Anderson Kill" and "Integrated" Defendants ("Moving Defendants")[2] moved for summary judgment

---

1. Those Defendants are the following: Kidder Peabody & Co.; GA Partners Inc.; Marine Midland Bank, N.A.; Hunter Publishing Co.; Deloitte & Touche; Cushman & Wakefield of Pennsylvania; Prudential–Bache Securities, Inc.; Manufacturers Hanover Trust Company; Ameritrust Company National Association; First Interstate Bank of California; Morgan Guaranty Trust Company of New York; Security Pacific National Bank; Signet Bank/Virginia; and Landauer Associates, Inc.

2. The following is a list of the Moving Defendants and their respective attorneys in each case. The Anderson Kill Defendants are represented by Anderson Kill Olick & Oshinsky ("AKOO"), and the Integrated Defendants are represented by Camhy Karlinsky & Stein ("CKS") and Townley & Updike ("TU").

*Research Triangle:* Research Triangle Associates Ltd. Partnership (AKOO), RTA Assocs. (AKOO), Tripark Corp. (AKOO), James R. Greene (AKOO), Durham Property Corp. (CKS), Integrated Resources Equity Corp. (CKS).

*600 Grant Street/Reagan:* 600 Grant Street Assocs. Ltd. Partnership (AKOO), DCGP Assocs. Ltd. Partnership (AKOO), Conzar Assocs. (AKOO), Zar Corp. (AKOO), Odin Management Co., L.P. (AKOO), Bartmil, Inc. (T & U), Integrated Resources Equity Corp. (T & U), Grant Property Corp. (T & U), Sivram Corp. (T & U), GA Partners Inc. (Arent Fox McGarrahan & Heard), Prudential Bache Securities Inc. (Cahill Gordon & Reindel), Kidder Peabody & Co., Inc. (Morrison & Foerster), Manufacturers Hanover Trust (Hunton & Williams).

*600 Grant Street/Schoonmaker:* DCPG Assocs. (AKOO), Conzar Assocs. (AKOO), Zar Corp.

dismissing the federal securities claims in the subject actions pursuant to Fed.R.Civ.P., Rules 12(b), 12(c), and 56, (Global Motion I), and for an order dismissing those claims under pursuant to Fed.R.Civ.P., Rules 12(b), 12(c), and 9(b) (Global Motion II), on February 21, 1992. Most of the Individual Defendants joined in these motions and either adopted the reasoning of the Anderson Kill and Integrated Defendants or submitted their own papers.[3]

Additionally, pursuant to Rule 12(b)(6), Fed.R.Civ.P., the Plaintiffs in *Lenox Towers* moved to dismiss counterclaims made against them by the Anderson Kill and Camhy Karlinsky & Stein Defendants. *See supra* note 2.

Oral argument on these motions was heard on June 10, 1992. The cross-motion of the *Lenox Towers* Plaintiffs is considered submitted as of that date. Various supplemental letter briefs were received by the Court through October 30, 1992 and October 2, 1992 on Global Motions I and II, respectively, and the Global Motions are considered submitted as of those dates.

*Global Motion I*

On Global Motion I, the Moving Defendants seek summary judgment dismissing most of the Plaintiffs' federal securities claims on the ground that the claims are untimely under the applicable statutes of limitations. The individual complaints allege claims under either § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, or § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2), or both. For the reasons set forth below, Global Motion I is granted in part and denied in part.

For simplicity's sake, the general legal principles governing the statute of limitations

(AKOO), Integrated Resources Equity Corp. (TU), Ron Jacobs (TU).

*Clovine/Standefer:* Clovine Assocs. Ltd. Partnership (AKOO), Kanzar Assocs. (AKOO), Newzar Assocs. (AKOO), Zar Corp. (AKOO), Somnat Corp. (CKS), Integrated Resources Equity Corp. (CKS), Landauer Assocs. (Carter, Ledyard & Milburn).

*Clovine/Ellingson:* Kanzar Assocs. (AKOO), Newzar Assocs. (AKOO), Zar Corp. (AKOO), Somnat Corp. (CKS), Integrated Resources Equity Corp. (CKS), Integrated Financial, Inc. (CKS), Landauer Assocs. (Carter, Ledyard & Milburn).

*West Palm/Coleman & West Palm/Baird:* EVP Fourth Corp. (AKOO), Richard H. Ader (AKOO), Arthur H. Goldberg (AKOO), Jay H. Zises (AKOO), Selig A. Zises (AKOO), Jay D. Chazanoff (AKOO), Alan H. Weiner (AKOO), Richard A. Oppenheim (AKOO), Resources Funding Corp. (CKS), IR West Palm Credit Corp. (CKS).

*Rittenhouse:* EVP Seventh Corp. (AKOO), Richard Ader (AKOO), Arthur Goldberg (AKOO), Jay H. Zises (AKOO), Selig A. Zises (AKOO), Jay D. Chazanoff (AKOO), Resources Funding Corp. (CKS), Integrated Resources Equity Corp. (CKS), IR Rittenhouse Square Credit Corp. (CKS), Cushman & Wakfield of Pennsylvania, Inc. (Jones, Day, Reavis & Pogue).

*Lenox Tower:* EVP Second Corp. (AKOO), Richard H. Ader (AKOO), Arthur H. Goldberg (AKOO), Jay H. Zises (AKOO), Selig A. Zises (AKOO), Jay D. Chazanoff (AKOO), Frank A. Savage (AKOO), Nancy Frankel (AKOO), Lenox Towers Ltd. Partnership (AKOO), Integrated Resources Equity Corp. (AKOO), Federick J. Spagnola (CKS), IR Lenox Towers Credit Corp. (CKS).

*Southern Inns:* Sevzar Assocs. (AKOO), Zar Corp. (AKOO), EVP Sixth Corp. (AKOO), Richard H. Ader (AKOO), Arthur H. Goldberg (AKOO), Jay H. Zises (AKOO), Selig A. Zises (AKOO), Jay D. Chazanoff (AKOO), Gary W. Krat (AKOO), Philip W. Cohen (AKOO), Joel M. Pashcow (AKOO), Daniel N. Davis (AKOO), Benjamin D. Fein (AKOO), Southern Inns Assocs. Ltd. Partnership (AKOO), Integrated Resources Equity Corp. (CKS), IR Southern Inns Credit Corp. (CKS).

*Fillmore/Greene's & Fillmore/Enviro:* Fillmore Pacific Assocs. Ltd. Partnership (CKS), IR Golden Gate, Inc. (CKS), Integrated Resources Equity Corp. (CKS), Resources Funding Corp. (CKS), Richard H. Ader (Proskauer Rose Goetz & Mendelsohn), Alan H. Weiner (Proskauer Rose Goetz & Mendelsohn), Ameritrust Company National Assoc. (Kornstein Veisz & Wexler ["KVW"]), First Interstate Bank of California (KVW), Morgan Guaranty Trust Company of New York (KVW), Security Pacific National Bank (KVW), Signet Bank/Virginia (KVW).

*Hunter Publishing:* IR Publishing Ltd. Partnership (CKS), Integrated Resources Equity Corp. (CKS), IR Publishing Credit Corp. (CKS); Hunter Publishing Co., Inc. (Ross & Hardies), Elliot Stein, Jr. (Ross & Hardies), I. Martin Pompadur (Ross & Hardies), Deloitte & Touche (Arnold & Porter).

*Intermobile:* Integrated MR Ltd. Partnership (CKS), Integrated MR, Inc. (CKS), Integrated Health Care Investments, Inc. (CKS), IR Intermobile Credit Corp. (CKS), Deloitte & Touche (Arnold & Porter).

**3.** Of all the Defendants against whom federal securities claims have been asserted in the fourteen actions and who have been served and have not settled, one failed to join in these motions, Bach & Associates, Inc., in *Research Triangle.*

issues will be set forth first. These principles will then be applied to the individual complaints on a case-by-case basis.

## I. The Statute of Limitations for the § 12(2) Claims

Section 13 of the 1933 Act provides that:

No action shall be maintained to enforce any liability created under section 77k or 77l (2) [12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created ... under section 77l (2) of this title more than three years after the sale.

15 U.S.C. § 77m.

▮ "The three-year time limit in section 13 is an absolute outer limit." *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 343 (S.D.N.Y.1986). Moreover, because compliance with § 13 is an essential ingredient of a § 12(2) claim, *see Morin v. Trupin*, 747 F.Supp. 1051, 1063 (S.D.N.Y.1990) ("*Morin I*") (quoting *Bresson*, 641 F.Supp. at 343), a complaint asserting such a claim must set forth:

(1) the time and circumstances of the discovery of the fraudulent statement;

(2) the reasons why it was not discovered earlier (if more than one year has lapsed since the making of the fraudulent statement); and

(3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

*Id.; see Friedman v. Arizona World Nurseries, Ltd. Partnership*, 730 F.Supp. 521, 543–44 (S.D.N.Y.1990).

Failure to comply with these requirements will subject an individual § 12(2) claim to dismissal. The issues concerning the individual discovery dates are set forth below in the § 10(b) discussion.

## II. The Statutes of Limitations for the § 10(b) Claims

Before the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow*

*v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), on June 20, 1991, Congress had never seen it fit to legislate a uniform statute of limitations for the implied right of action arising out of § 10(b). Once the Court announced such a limitations period in *Lampf, see* —— U.S. at —— & n. 9, 111 S.Ct. at 2782 & n. 9, and directed that it be applied retroactively, *see Welch v. Cadre Capital*, 946 F.2d 185, 187 (2d Cir.1991) ("*Welch II*"); *Ahmed v. Trupin*, 781 F.Supp. 1017, 1021 (S.D.N.Y.1992), Congress responded by amending the 1934 Act and inserting a new § 27A:

(a) EFFECT ON PENDING CAUSES OF ACTION.—The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

(b) EFFECT ON DISMISSED CAUSES OF ACTION.—Any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991—

(1) which was dismissed as time barred subsequent to June 19, 1991, and

(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991,

shall be reinstated on motion by the plaintiff not later than 60 days after the date of enactment of this section.

Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, § 476, 105 Stat. 2236 (codified at Securities Exchange Act of 1934, § 27A, 15 U.S.C. § 78aa–1).

This action includes cases filed after the Supreme Court's decision in *Lampf;* cases filed in the Second Circuit before *Lampf,* but after the November 8, 1990 decision in *Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 364 (2d Cir.1990) (adopting uniform limitations period § 10(b) actions); cases filed in the Second Circuit before *Ceres Partners;* and

cases filed in federal district courts outside the Second Circuit.

Such a state of affairs rarely lends itself to simply stated rules, and the present motions are no exception. Rather, myriad issues must be addressed, including the constitutional validity of § 27A; the applicable statute of limitations for each case and, in certain instances, for each Plaintiff; whether the limitations period from some other circuit can be applied here; and at what point various Plaintiffs should have discovered the conduct upon which their claims are based.

### A. The § 10(b) Statute of Limitations to be Applied to Claims Filed on or after June 20, 1991

In *Lampf*, the Supreme Court held that private actions under § 10(b) must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation. *See* — U.S. at —, 111 S.Ct. at 2781–82. In adopting this uniform federal statute of limitations, the Court borrowed from § 9(e) of the 1934 Act, 15 U.S.C. § 78i(e), which provides:

No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

*See* — U.S. at — n. 9, 111 S.Ct. at 2781–82.

The Court also noted that the language used in § 9(e) of the 1934 Act varies from that used in the 1933 Act. *See id.* While § 13 of the 1933 Act imposes a strict three-year limit from the date of "sale," § 9(e) of the 1934 Act imposes such a limit "after the cause of action accrued". *Compare* 15 U.S.C. § 77m *with id.* § 78i(e). To the extent this difference has any substantive effect in an individual case will be determined in applying the statute of limitations below.

■The Supreme Court decided *Lampf* on June 20, 1991. Section 27A is directed at only those cases commenced on or before June 19, 1991. Therefore, § 9(e) limitations period will be applied to the § 10(b) claims in the cases commenced on or after June 20, 1991.

### B. Section 27A is Not Unconstitutional

■ This Court fully considered the question of § 27A's constitutionality based on briefs filed by counsel to most of the parties to this litigation in *Rabin v. Fivzar Assocs.*, 801 F.Supp. 1045, 1051–56 (S.D.N.Y.1992). Additional materials submitted in this matter shed no further light on the decision there that the statute does not violate principles of separation of powers and due process. *See id.* at 1056; *cf. Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 967 F.2d 742, 751 n. 6 (2d Cir.1992).

### C. The § 10(b) Limitations Period to be Applied to Claims Filed before June 20, 1991, and on or after November 8, 1990

■ The statute of limitations for § 10(b) in the Second Circuit required that the case be brought within one year of discovery of the fraud and within three years of the fraud some seven months before *Lampf* was decided. In *Ceres*, the Second Circuit concluded that the limitations period found in §§ 9 and 18 of the 1934 Act should apply to implied claims brought under § 10(b), the same period selected by the Supreme Court in *Lampf*. *See Ceres*, 918 F.2d at 364. Therefore, all those § 10(b) claims filed on or after November 8, 1990, the date *Ceres* was decided, will be subject to the uniform one-year/three-year period adopted in *Ceres* and *Lampf*. *See* 15 U.S.C. § 78aa–1; *Henley v. Slone*, 961 F.2d 23, 24 (2d Cir.1992).

The Integrated lawsuits originally filed in this Court after November 8, 1990 and therefore bound by the statute of limitations laid down in *Ceres* are *West Palm/Baird* (filed February 12, 1991), *West Palm/Coleman* (filed January 23, 1991), *Fillmore/Greene's* (filed February 8, 1991), *Fillmore/Enviro* (filed March 7, 1991), *Hunter Publishing* (filed April 1, 1991),[4] and *600 Grant Street/Reagan* (filed April 12, 1991).

---

4. The Moving Defendants raise no real issue concerning the timeliness of the Original Complaint

Two other lawsuits were originally filed in the Southern District of New York just before the Second Circuit handed down the new statute of limitations in *Ceres: Lenox Towers* (filed November 2, 1990) and *Southern Inns* (filed October 19, 1990). Claims in these two cases will be governed by the Second Circuit's prior practice of borrowing the most analogous state statute of limitations for the § 10(b) claims. *See Ades v. DeLoitte & Touche,* Fed.Sec.L.Rep. (CCH) ¶ 96,469 (S.D.N.Y.1992). The § 12(2) claims in these cases, of course, continue to be governed by the one-year/three-year statute of limitations prescribed by § 13 of the 1933 Act, 15 U.S.C. § 77m.

### D. Determining the Applicable § 10(b) Limitations Periods for Claims Filed in Other Jurisdictions

The other three lawsuits were originally filed elsewhere and then transferred to this Court by the Judicial Panel on Multidistrict Litigation. The complaints were filed in Arizona, Phoenix Division (*Research Triangle,* filed Jan. 3, 1991), the Central District of California (*600 Grant Street/Reagan,* filed April 12, 1991), and the Southern District of Ohio, Western Division (*Clovine/Standefer,* filed April 9, 1991, and *Clovine/Ellingson,* filed March 14, 1991).

In all three, both the Plaintiffs and the Moving Defendants agree that the fraud occurred more than three years before the Plaintiffs brought suit. Since the alleged fraud occurred when the Plaintiffs were induced to purchase their partnership interests, and since in *Research Triangle* and *Clovine/Standefer* the latest Plaintiffs purchased in 1986, claims in all three actions are time-barred under Second Circuit law.

The *Clovine/Ellingson* Plaintiffs contend that the Court must use the § 10(b) statute of limitations of the district in which the action was filed, on the grounds that the transferor state's jurisdiction is the "jurisdiction" meant by § 27A. The Plaintiffs in the

other two partnership actions maintain it would be "inequitable" to apply Second Circuit law to these claims.

The definition of "jurisdiction," however, is not quite as clear cut as the *Clovine/Ellingson* Plaintiffs make it out to be. Prior to the statute's enactment, the crazy-quilt of statutes of limitations employed in § 10(b) actions was well known. *See Ceres,* 918 F.2d at 353–60. At the most, § 27A has done nothing more than codify this procedural morass in place.

#### 1. Second Circuit Law Before "Ceres"

Prior to *Ceres,* courts within the Second Circuit traditionally applied the forum state's most analogous statute of limitations to claims under § 10(b). *See Welch v. Cadre Capital,* 923 F.2d 989, 993 (2d Cir.) ("*Welch I*"), *vacated and remanded sub nom. Northwest Sav. Bank, PaSa v. Welch,* — U.S. —, 111 S.Ct. 2882, 115 L.Ed.2d 1048, *aff'd,* 946 F.2d 185 (2d Cir.1991); *Armstrong v. McAlpin,* 699 F.2d 79, 86–87 (2d Cir.1983). In the Southern District of New York, that statute of limitations is contained in both the State's statute of limitations for common-law fraud actions and its "borrowing statute". *See Armstrong,* 699 F.2d at 87; *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977); *Morin v. Trupin,* 799 F.Supp. 342, 345 (S.D.N.Y.1992) ("*Morin III*").

In the case of plaintiffs who were residents of New York State at the time of the injury, the former period set forth in N.Y.Civ. Prac.L. & R. § 213(8) (McKinney 1990 Supp.) applies: The action must be commenced within six years of the commission of the alleged fraud or two years from the time the alleged wrongdoing was, or with reasonable diligence should have been, discovered. *See Armstrong,* 699 F.2d at 87; *Morin III,* 799 F.Supp. at 345. In those cases where the plaintiffs were nonresidents at the time the cause of action accrued, N.Y.Civ.Prac.L. & R. § 202 (McKinney 1990) applies.

Under this "borrowing statute," a court is to apply the limitations period "of either

---

filed in the *Hunter Publishing* action, contending only that the *Hunter Publishing* Plaintiffs were placed on inquiry notice of their claims by the publicity of Integrated's financial demise. The Original Complaint was timely filed. This leaves

only the issue of the timeliness of the forty-five Plaintiffs added in the two subsequent Amended Complaints in this action within the scope of the Global Motion I.

[New York] or the place without [New York] where the cause of action accrued," whichever is shorter. *See Bresson*, 641 F.Supp. at 349; *Klock v. Lehman Brothers Kuhn Loeb, Inc.*, 584 F.Supp. 210, 214 (S.D.N.Y.1984). "Thus, if a suit brought in the 'place' of the plaintiff's residence would be time-barred, the suit in a New York federal court is time-barred." *Ceres*, 918 F.2d at 353 (citations omitted).

As this Court recently noted:

Although federal courts look to state law for the applicable limitations period, they look to federal law for guidance as to the appropriate accrual and equitable tolling principles. *See ITT v. Cornfeld*, 619 F.2d 909, 929 (2d Cir.1980) (period commences to run "when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which the exercise of reasonable diligence should have led to actual knowledge"); *Baskin v. Hawley*, 807 F.2d 1120, 1130–31 (2d Cir.1986).

A plaintiff must bring a § 10(b) action in federal court. Thus, in applying the rule of "the place without the state where the cause of action accrued" a federal court sitting in New York does not automatically turn to state law but rather must look to the statute of limitations that would be applied by the federal district court where the nonresident plaintiff resided at the time of the injury. *See Ceres*, 918 F.2d at 353; *Ahmed v. Trupin*, 781 F.Supp. 1017, 1022–23 (S.D.N.Y.1992).

*Morin III*, 799 F.Supp. at 347. Therefore, the Court must look to the relevant states for statutes of limitations governing the § 10(b) actions filed before *Ceres*. In the matter at hand, this applies to the actions filed in *Lenox Towers* and *Southern Inns*.

### 2. Retroactivity as Determined by Chevron

■ Although the *Ceres* court explicitly refused to address the retroactive effect of its ruling, *see Ceres*, 918 F.2d at 364, the Second Circuit resolved that question in *Welch I*, 923 F.2d at 993–95. *Welch I* established that the retroactive application of *Ceres* must be determined on a case-by-case basis according to a three-part test laid out in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92

S.Ct. 349, 30 L.Ed.2d 296 (1971). Only then should the court return to the Second Circuit's prior practice of applying the most analogous state statute of limitations. The three parts of the test hinge on 1) whether the new rule was "clearly foreshadowed" at the time the relevant complaint were filed, 2) whether retroactive application of the statute of limitations would serve the purpose of the new rule, and 3) whether the equities weighed in favor of nonretroactivity. *See Chevron*, 404 U.S. at 106–7, 92 S.Ct. at 355–56; *Welch I*, 923 F.2d at 993–95; *Rabin*, 801 F.Supp. at 1049.

■ The argument offered by the Plaintiffs in *Research Triangle* and *Clovine/Standefer*—that this Court's failure to apply the law of the transferor state would work harsh inequities—is only one part of the test, not a determination of the whole. Whether retroactive application of the law was foreseeable and whether it serves the purpose of the law is more significant here: "As for the third *Chevron* factor, the courts have held that the retroactive application of *Ceres* does not produce substantial inequitable results when the statute of limitations is unchanged by retroactive application," as it is for cases filed after November 8, 1990. *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1269 (S.D.N.Y.1992) (applying *Ceres* statute of limitations to case transferred pursuant to 28 U.S.C. § 1407). The law of the jurisdiction is Second Circuit law.

The second prong of the *Chevron* test—that retroactive application will further the new rule—does warrant retrospective application under *Ceres*. In the context of a transferred class action, the traditional method of looking to the state of each nonresident class plaintiff to determine whether each claim would be time-barred could result in the claims of some plaintiffs being time-barred while the claims of others would not be. This result would be at least as inequitable as the result envisioned by the Plaintiffs if *Ceres* were applied to their claims in *Clovine/Standefer* and *Research Triangle*. *See Chaus*, 801 F.Supp. at 1269.

The uniform application of *Ceres* in this context does further the rule because here

the rule is not, strictly speaking, retroactive. All four Complaints were filed in their respective jurisdictions after November 8, 1990: *Research Triangle* on January 3, 1991; *Clovine/Ellingson* on March 14, 1991; *Clovine/Standefer* on April 9, 1991; *600 Grant Street/Reagan* on April 12, 1991. If the Plaintiffs could avoid the application of Second Circuit law merely by filing their claim in an inconvenient forum which had a longer statute of limitations, and then take that statute of limitations with them when their case was transferred, they could make an end run around the rule laid down by *Ceres.* Although this is now impossible for all claims filed after June 19, 1991, due to the Supreme Court's decision in *Lampf,* the eight-month lag between *Ceres* and *Lampf* creates an apparent window of opportunity which the Plaintiffs should not be allowed to exploit.

Finally, the first prong of the *Chevron* test—that the rule changes the practice in this Circuit—is met for cases filed here, and for cases transferred here but not transferred as part of MDL litigation. The precedents for MDL cases are not as clear-cut as for cases filed under other statutes, because the special concerns inherent in MDL litigation have been reflected in the case law.

### 3. Multidistrict Litigation

The multidistrict transfer statute, 28 U.S.C. § 1407, attempts to provide for the "just and efficient conduct" of related cases scattered throughout the federal courts by consolidating such cases before one court. *See* 28 U.S.C. § 1407(a). One of the key means by which this goal is achieved is through the establishment of a single body of law for the unified proceedings. *See generally In re Korean Air Lines Disaster,* 829 F.2d 1171, 1176–84 (D.C.Cir.1987) (Ginsburg, J., concurring), *aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *see also In re Pan American Corp.,* 950 F.2d 839, 847 (2d Cir.1991) (adopting *Korean Air Lines*). Without such a mechanism, "[t]he conduct of multidistrict litigation, which is invariably time consuming as it is, will grind

to a standstill while transferee judges read separate briefs, each based on the case law of a transferor circuit, on a single issue of federal law." *Pan Am,* 950 F.2d at 847. In most cases such an effort should be futile, since it must be presumed that the Supreme Court will eventually resolve any pertinent split among the circuits and set down a uniform federal law. *See, e.g., Chan,* 490 U.S. at 124–25, 135, 109 S.Ct. at 1678–79, 1684 (resolving the split at issue in *Korean Air Lines* ).

The *Clovine/Ellingson* Plaintiffs argue that under *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964),[5] *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court must apply the statute of limitations that each transferor court would have applied to these actions. *See Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 406 (2d Cir. 1975); *H.L. Green Co. v. MacMahon,* 312 F.2d 650, 653 (2d Cir.1962), *cert. denied,* 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963); *In re Plumbing Fixtures Litig.,* 342 F.Supp. 756, 758 (J.P.M.L.1972) (per curiam).

Although this argument finds support within *Erie* 's progeny, *see Walker v. Armco Steel Corp.,* 446 U.S. 740, 752–53, 100 S.Ct. 1978, 1986, 64 L.Ed.2d 659 (1980); *Guaranty Trust Co. v. York,* 326 U.S. 99, 110–12, 65 S.Ct. 1464, 1470–71, 89 L.Ed. 2079 (1945), it ignores the fundamental difference between those cases and the present litigation, just as the *Clovine/Ellingson* Plaintiffs' reliance on New York law ignores the fact that this cause of action can only be tried in a federal court. Jurisdiction here is based on a federal question. As such, *Erie* 's familiar concerns over state law are inapplicable here. *See West v. Conrail,* 481 U.S. 35, 39 n. 4, 107 S.Ct. 1538, 1541 n. 4, 95 L.Ed.2d 32 (1987); *Isaac v. Life Inv. Ins. Co.,* 749 F.Supp. 855, 863 (E.D.Tenn.1990); *see also* Richard L. Marcus, *Conflicts Among the Circuits and Transfers Within the Federal Judicial System,* 93 Yale L.J. 677, 679 (1984) ("*Erie* is

---

**5.** Superseded by statute as stated in *Ross v. Colorado Outward Bound Sch., Inc.,* 822 F.2d 1524

(10th Cir.1987).

simply irrelevant where federal claims are involved").

The reasoning in the cases relied on by the *Clovine/Ellingson* Plaintiffs in making this argument has been subsequently rejected. The line of authority holding that a transferee court should apply the law of the transferor court in federal claims transferred pursuant to § 1407 finds its genesis in *Plumbing Fixtures,* 342 F.Supp. at 758 ("It is clear that the substantive law of the transferor forum will apply after transfer," citing *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). This language has, however, been expressly withdrawn by the Multidistrict Panel:

> Any suggestion to the contrary in dictum found in *Plumbing Fixtures* is withdrawn. Indeed, the dictum in *Plumbing Fixtures* is itself questionable given that *Plumbing Fixtures* was a litigation arising under the federal courts' federal question jurisdiction and *Van Dusen,* on which the Panel relied in support of its dictum, was an action arising under the federal courts' diversity jurisdiction.

*In re General Motors Class E Stock Buyout Sec. Litig.,* 696 F.Supp. 1546, 1547 n. 1 (J.P.M.L.1988). The other cases these Plaintiffs have cited in support of this argument principally rely on *Plumbing Fixtures. See, e.g., Berry Petroleum,* 518 F.2d at 408 n. 7; *In re Haven Industries, Inc.,* 462 F.Supp. 172, 179 (S.D.N.Y.1978). To this extent, then, the reasoning of these cases is now called into question.

In its place, the federal courts have adopted two considerations for cases transferred under 28 U.S.C. § 1407: first, that statutes of limitations are either federal or procedural in nature, and second, that the circuits do not need to defer to other circuits' interpretation of federal law if it conflicts with their own.

In the MDL context, the statute of limitations may not be a matter of state law at all, and as such, the limitation period should be decided by a federal transferee court in accordance with its own interpretation of federal law "without deference to any contrary interpretation of a transferor circuit." *In re General Dev. Corp. Bond Litig.,* 800 F.Supp.

1143, 1146 (S.D.N.Y.1992). Since "the choice of a limitations period for a federal cause of action is itself a question of federal law," *Del Costello v. International Brotherhood of Teamsters,* 462 U.S. 151, 159 n. 13, 103 S.Ct. 2281, 2288 n. 13, 76 L.Ed.2d 476 (1983), the limitations periods for federal causes of action, from wherever derived, are *not* matters of state law in any meaningful sense and should not, in the transfer context, implicate *Van Dusen* principles. As the court in *General Development* noted:

> "[I]t seems ... clear that the best reading of the F.D.I.C.'s Improvement Act's phrase "laws applicable in the jurisdiction," as it applies to a complaint ... filed before the date of the decision in *Lampf* and transferred here, is that the jurisdiction referred to must be the one in which the federal transferee court sits ... *i.e.,* the one- and three-year period set forth in *Ceres Partners.*"

800 F.Supp. at 1148.

Even if the choice of the limitations period is not itself a question of federal law, there is another reason why a federal limitations period should govern. Federal courts have viewed questions pertaining to the statutes of limitations for federal securities claims as procedural, not substantive, matters, and they are, therefore, subject to the federal law of the transferee court. *See, e.g., Singer v. Olympia Brewing Co.,* 878 F.2d 596, 599 (2d Cir.1989); *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 73 (S.D.N.Y.1991).

In short, the Plaintiffs have presented no compelling reason to require the rejection of the holdings of *Pan Am* and *Korean Air Lines.* The Second Circuit's rules for determining which statute of limitations to apply to the individual § 10(b) claims therefore govern. *See Pan Am,* 950 F.2d at 847; *Korean Air Lines,* 1175–76.

> Despite the expectation of some supporters of section 27A that it would routinely apply a more generous state or federal common law limitations period to all suits pending on June 19, 1991, we see no escape from the clear statutory language requiring the application of "the laws applicable in the jurisdiction."

*Henley v. Slone,* 961 F.2d 23, 25 (2d Cir.1992) (refusing to apply common-law fraud statute of limitations to securities fraud claim brought in Connecticut).

### E. *New York Law*

■ Finally, the *Clovine/Ellingson* Plaintiffs contend that a general choice of law clause in their limited partnership materials mandates that New York's six-year statute of limitations for common-law fraud should apply. The clause in question reads:

> This Agreement, the Notes, any amendments or replacements hereof and thereof, and the legality, validity and performance of the terms hereof and thereof, shall be governed by and construed in all respects in accordance with the internal laws of the State of New York ... applicable to contracts, transactions and obligations entered into and to be performed in New York.

Pls.' Mem. in Opp. Ex. A at 3.

This contention fails for two reasons. First, the clause is a generic choice of law clause governing the interpretation of contracts. Such clauses generally do not apply to statutes of limitations; indeed, this clause is silent as to the issue. Absent an express term, the clause does not alter the federal law applicable to this federal claim. *See Des Brisay v. Goldfield Corp.,* 637 F.2d 680, 682 (9th Cir.1981); *Gatto v. Meridian Medical Assocs., Inc.,* No. Civ. A 87–5076 (JCL), 1989 WL 23125 (D.N.J. Feb. 9, 1989).

■ Second, if the New York choice of law clause does apply, it would have to be read as requiring the application of the law of a federal court sitting in New York. Section 27 of the 1934 Act grants federal courts with exclusive jurisdiction of federal securities claims. *See Ceres,* 918 F.2d at 353. A plaintiff must begin a § 10(b) action in federal court. A federal court sitting in New York cannot automatically turn to state law but must first look to the statute of limitations that would be applied by the federal district court in the state where the plaintiff brought his § 10(b) action. Therefore, Second Circuit, not New York, law would apply. *See id.; Ahmed,* 781 F.Supp. at 1022; *Marlow v. Gold,* [1991 Transfer Binder] Fed.Sec.L.Rep.

(CCH) ¶ 96,112, 1991 WL 107268 (S.D.N.Y. 1991).

### F. *Determining When Plaintiffs Were Placed on Inquiry Notice*

■ In the Second Circuit, the statute of limitations for securities fraud claims begins to run when the plaintiff has actual knowledge of the alleged fraud or when the plaintiff is placed on *inquiry notice,* to wit, when the plaintiff has "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir.1979) (quoting *Stull v. Bayard,* 561 F.2d 429, 432 (2d Cir.1977), emphasis added).

> Thus, the statute is not tolled for a plaintiff's "leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). Instead, the period runs from the time at which a plaintiff "should have discovered the general fraudulent scheme." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir.1979) (quoting *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975)).

*Kronfeld v. Advest, Inc.,* 675 F.Supp. 1449, 1458 (S.D.N.Y.1987); *accord Arneil,* 550 F.2d at 780.

#### 1. The Objective Test

■ The Second Circuit has held that the test determining whether a plaintiff was placed on inquiry notice is "objective" in nature.

> The means of knowledge are the same thing in effect as knowledge itself. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him. This rule is fully applicable in cases ... which involve claims of securities fraud.

*Armstrong,* 699 F.2d at 88 (citations and internal quotations omitted). This objective test mandates a dismissal of or summary judgment on a plaintiff's securities fraud

claim when the "pleadings disclose facts sufficient to have placed the plaintiff on inquiry notice of the alleged fraud prior to the one-year cutoff." *Bresson,* 641 F.Supp. at 345.

■ To satisfy this test, the knowledge of the alleged fraud imputed to a plaintiff must rise to the level of the probable and not merely of the possible. When inquiry notice is asserted by a defendant as the basis for a summary judgment motion, as is the case here, the defendant has the burden of showing that no genuine issue of material fact exists as to whether the plaintiff, exercising reasonable diligence, would have discovered the fraudulent scheme by the dates identified by the defendant. *See Kronfeld,* 675 F.Supp. at 1458. The defendant also must establish that the circumstances in question suggested to the plaintiff the probability that he allegedly had been defrauded and not the mere possibility of the alleged fraud to trigger inquiry notice and start the running of the statute of limitations period. *See Armstrong,* 699 F.2d at 88; *see also Zola v. Gordon,* 685 F.Supp. 354, 367 n. 14 (S.D.N.Y.1988) (*"Zola I "*) (rejecting as "incorrect" the proposition in *Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2d Cir.1972), that inquiry notice is triggered when the imputed knowledge is of the possibility of fraud).[6]

### 2. Deciding Motions for Summary Judgment Based on Inquiry Notice

This Court has noted the care with which a motion for summary judgment based on an assertion of inquiry notice must be decided, because the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide. *See Intre Sport, Ltd. v. Kidder, Peabody & Co.,* 625 F.Supp. 1303, 1310 (S.D.N.Y.1985), *aff'd without opinion,* 795 F.2d 1004 (2d Cir.1986), *vacated on other grounds,* 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987). As the Second Circuit stated in *Robertson,*

> [i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case— similar to the type of inferences that must be drawn in determining intent and good

faith, [and w]hen conflicting inferences can be drawn from the facts, ... summary judgment is inappropriate.

609 F.2d at 591. In light of these considerations, this Court has concluded it is only in "extreme circumstances" that summary judgment is appropriate when the defendants assert that the action was untimely commenced because inquiry notice was triggered more than a year before the action was brought by the plaintiff. *Freschi v. Grand Coal Venture,* 583 F.Supp. 780, 785 (S.D.N.Y. 1984).

These circumstances do obtain when a court readily can impute knowledge of a probable fraud to the plaintiff from the face of the documents and facts in evidence supporting the motion for summary judgment without having to assume the role of the jury and undertake a detailed deductive analysis of the factual record to justify that imputation of such knowledge to the plaintiff. Thus, in *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 778 F.Supp. 695, 700 (S.D.N.Y.1991), Judge Conner stated that,

> [w]hile defendants spend an inordinate amount of time in their papers trying to prove the essentially factual issue of what plaintiff knew and when plaintiff knew it, this Court is reluctant to engage in the type of fact-finding defendants request on a motion for summary judgment.

*Cf. Friedman v. Meyers,* 482 F.2d 435, 439 (2d Cir.1973) (summary judgment is "particularly inappropriate" when inferences which the parties sought to have drawn regarding the discovery of the alleged fraud were questions of motive, intent, and subjective feelings and reactions).

Nonetheless, when these circumstances do obtain, the issues of inquiry notice and the discovery of the alleged fraud may be decided by the court as a matter of law and the court "should not be reluctant to grant summary judgment." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 981 (S.D.N.Y.1989); *see In re General Dev. Corp. Bond Litig.,* 800 F.Supp. 1128, 1136 (S.D.N.Y.1992) (because the test of in-

6. This Court follows *Armstrong* and those cases decided under it.

quiry notice is objective, "a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases" in the context of a motion to dismiss); *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 663–64 (S.D.N.Y.1987) (quoting *Rickel v. Levy,* 370 F.Supp. 751, 756 (E.D.N.Y.1974) and *Cook v. Avien, Inc.,* 573 F.2d 685, 697–98 (1st Cir.1978), that general suspicions and "storm warnings" in financial data trigger inquiry notice upon which summary judgment may be granted); *Kronfeld,* 675 F.Supp. at 1458 ("the cases are legion in which summary judgment has been granted on the ground that the plaintiff should have discovered his cause of action under the securities law before the statute of limitations had run"); *Harner v. Prudential Sec. Inc.,* 785 F.Supp. 626 (E.D.Mich.1992) ("where … the underlying facts are undisputed, even factually-based issues may be decided as a matter of law").[7]

3. Information Triggering Inquiry Notice

█ The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data available to the plaintiffs providing them "with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]."[8] *Quantum Overseas,* 663 F.Supp. at 664 (quoting *Cook,* 573 F.2d at 697–98). Such data may come in the form of the letters and other documents provided to limited partners by the partnership, *see Bresson,* 641 F.Supp. at 341; *Farr,* 755 F.Supp. at 1225; *Miller v. Grigoli,* 712 F.Supp. 1087, 1088 (S.D.N.Y.1989); *Hirschler v. GMD Inv. Ltd. Partnership,* [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,919, 1991 WL 115773 (E.D.Va. Mar. 28, 1991); the offering materials themselves, *see Marlow v. Gold,* [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,112, at 90,633–90,635, 1991 WL 107268 (S.D.N.Y. June 6, 1991); *Landy v. Mitchell Petro. Tech. Corp.,* 734 F.Supp. 608, 617 (S.D.N.Y.1990); *Kennedy v. Josephthal & Co.,* 814 F.2d at 798, 802 (1st Cir.1987); *Hirschler,* ¶ 95,919, at 99,564; *Bender v. Rocky Mountain Drilling Assocs.,* 648 F.Supp. 330, 334–35 (D.D.C.1986); and public disclosures in the media about the financial condition of the defendant and other lawsuits alleging fraud committed by the defendant, *see Arneil,* 550 F.2d at 781; *Zola II,* 701 F.Supp. at 70; *Korwek v. Hunt,* 646 F.Supp. 953, 959 (S.D.N.Y.1986), *aff'd,* 827 F.2d 874 (2d Cir.1987); *Bresson,* 641 F.Supp. at 345; *Gluck v. Amicor, Inc.,* 487 F.Supp. 608, 613–14 & n. 6 (S.D.N.Y.1980).

---

7. A representative sampling of recent cases in which the issues of inquiry notice and discovery of fraud were decided as a matter of law includes the following: *Armstrong,* 699 F.2d at 88 (motion to dismiss); *Arneil,* 550 F.2d at 781 (summary judgment motion); *Berry Petroleum,* 518 F.2d at 411 (summary judgment motion); *Farr v. Shearson Lehman Hutton, Inc.,* 755 F.Supp. 1219, 1225 (S.D.N.Y.1991) (summary judgment motion); *Dimplex v. Scovill, Inc.,* No. 88 Civ. 7983 (LMM), 1991 WL 168041, at *5, 1991 U.S.Dist. LEXIS 18032, at *14 (S.D.N.Y. Aug. 22, 1991) (motion to dismiss); *Dolan v. Rothschild Reserve Int'l, Inc.,* No. 90 Civ. 1003 (MP), 1991 WL 155770, at *2 (S.D.N.Y. Aug. 8, 1991) (motion to dismiss RICO claim predicated on securities fraud allegations); *Marlow v. Gold,* [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,112, at 90,633, 1991 WL 107268 (S.D.N.Y. June 6, 1991) (motion to dismiss); *Landy v. Mitchell Petro. Tech. Corp.,* 734 F.Supp. 608, 617 (S.D.N.Y.1990) (motion to dismiss); *Cohen v. Prudential–Bache Sec., Inc.,* 713 F.Supp. 653, 663 (S.D.N.Y.1989) (motion to dismiss); *Henkind v. Brauser,* [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,488,

at 93,123, 1989 WL 54109 (S.D.N.Y. May 16, 1989) (motion to dismiss); *Goodman v. Shearson Lehman Bros., Inc.,* 698 F.Supp. 1078, 1082 (S.D.N.Y.1988) (motion to dismiss RICO claim predicated on securities fraud allegations); *Zola v. Gordon,* 701 F.Supp. 66, 70 (S.D.N.Y.1988) ("*Zola II* ") (summary judgment motion); *Zola I,* 685 F.Supp. at, 365 (summary judgment motion); *Bresson,* 641 F.Supp. at 345 (motion to dismiss).

8. Of course, the triggering financial data must be such that it *relates directly* to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants. *Compare Freschi,* 583 F.Supp. at 785 (disclosures of the high-risk nature of the investment did *not* trigger inquiry notice when plaintiffs' claims were based on alleged misrepresentations not related to the riskiness of the investment) *with Farr,* 755 F.Supp. at 1225–26 (disclosures of the high-risk nature of the investment *did* trigger inquiry notice when plaintiffs' claims were based on alleged misrepresentations related to the unsuitability of the investment as too risky).

Furthermore, neither reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place, relieves the plaintiff of his duty to undertake reasonable inquiry or tolls the statute of limitations. For example, in *Zola I*, the plaintiffs contended that the IRS notice did not start the statute of limitations because the defendant allegedly sent the plaintiffs a letter representing that he intended to fight the IRS, and because the defendant had stated earlier that the partnership had obtained its own expert appraisals supporting its valuation of the firm. *See* 685 F.Supp. at 366–67.

 The court rejected this position, stating that "as a matter of law plaintiffs would not be entitled to rely on 'reassuring comments' given them after they received constructive knowledge of the fraud." *Id.* at 366. The court also rejected the plaintiffs' contention that the defendant's continuing failure to disclose material facts which originally had been misrepresented constituted fraudulent concealment sufficient to further toll the statute of limitations:

> The suppression of this information simply is irrelevant to plaintiffs' duty to inquire, which was triggered by receipt of the IRS report. *See Hupp [v. Gray,* 500 F.2d 993,] 997 [ (7th Cir.1974) ] ("the fact which would have put a reasonable person on notice of the possibility of fraud ... was concealed"). . . . Plaintiffs present no facts indicating that they undertook any inquiry whatsoever. The court can only reach one conclusion, that plaintiffs remained narcose.

*Zola I,* 685 F.Supp. at 368 (footnote omitted). *See also Farr,* 755 F.Supp. at 1228 ("statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance do not rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry presented by the cold numbers contained in the [reports]"). Thus, once placed on inquiry notice, a limited partner cannot avoid the duty to inquire by relying on reassurances and optimistic statements made by the partnership.

### 4. Inquiry Notice of Integrated's Demise

This Court has previously noted that sophisticated investors legally may be presumed to know of information in the public domain, such as newspapers and magazine articles. *See Hartford Fire Ins.,* 723 F.Supp. at 976. In *Hartford,* the plaintiff bondholders claimed that Federated had committed a material omission by failing to disclose the risk that Federated would be the subject of a leveraged buyout and the adverse impact that such a buyout would have on the subject debt instruments. *See id.* at 981–83, 987.

On the defendants' motion for summary judgment, this Court held that the alleged omissions were not material, and dismissed the plaintiffs' §§ 10(b) and 12(2) claims. *See id.* at 990. This disposition followed from the fact that the disclosure of the omitted information would not have affected the "total mix" of available information because plaintiffs already should have known of such matters from general publicity accorded Federated in the media. *See id.* at 988. There, over sixty newspaper articles and financial reports in the general press and financial community had identified Federated as an "attractive" takeover candidate and had outlined the negative effect of takeovers on investment grade securities, such as the notes in which plaintiffs subsequently invested. *See id.* at 987–88 (citing *Business Week* and *The New York Times* articles); *see also Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978) (plaintiff shareholders presumed to know information in public domain); *Goldberger v. Baker,* 442 F.Supp. 659 (S.D.N.Y.1977) (allegations of material omissions insufficient where omitted information was a "matter of public knowledge that anyone could acquire by reading a newspaper with an Amex listing").

The Moving Defendants assert that the central allegation raised by the Plaintiffs in their various Complaints, which serves as the unifying thread throughout all of the actions, is the allegation that the Plaintiffs relied on the Defendants' misrepresentations and material omissions regarding the financial stability of Integrated. The Moving Defendants assert further that, in light of the extensive publicity surrounding the collapse of Inte-

grated, the Plaintiffs were placed on inquiry notice of this central aspect of their fraud claim from June 1988.[9]

At oral argument, however, the Plaintiffs denied that reliance on Integrated's financial condition to secure the financial viability of the various limited partnerships is a key unifying feature and one of the common elements of the alleged fraud perpetrated by the Defendants. Rather it was asserted that the only commonality among these cases is that "most of the defendants are Integrated or Integrated-related entities or elements." Tr. at 34. Thus, there are several unique elements of the fraud that relates to Integrated:

> It is different for each partnership.... Integrated is there because we allege control in some cases, we allege guarantees in some cases, but in each case there is a specific fraud which is unique to that partnership. Or there might be a group of partnerships that have a specific fraud that we are focusing on now.

*Id.*

██ The Plaintiffs allege "until [they] were advised that the units were not sold out, there was no damage," and contend from this claim that, because only then was each Partnership faced with the need to borrow money to cover the shortfall, "Integrated is not necessarily an integral part of that fraud or the damage." Tr. at 35. The Plaintiffs derive, as a final conclusion from this analysis, the proposition that "until the plaintiffs, the investors, were on notice of the shortfall, they were not on notice of any fraud." *Id.*

Despite the Plaintiffs' blanket denial of their reliance on Integrated's financial condition in deciding to invest in these Partnerships, the final determination of this issue turns on what the Plaintiffs actually pleaded in their various Complaints regarding the Defendants' allegedly fraudulent scheme. Thus, to the extent that the Plaintiffs allege in their Complaints that the fraud committed by the various limited partnerships was, in whole or in part, tied to misrepresentations or omissions about the financial condition of Integrated, the media reports regarding the financial demise of Integrated placed the Plaintiffs on inquiry notice about the probability of the alleged fraud caused by investing in these Partnerships out of reliance on the financial condition of Integrated and the assumption that Integrated would be in a position to finance any shortfall caused by undersubscription of the offerings.

### G. Pleading Compliance with the Statute of Limitations

██ This Court has directed that plaintiffs asserting securities fraud claims must, *inter alia*, plead with specificity the date of purchase of the securities at issue. *See Morin I*, 747 F.Supp. at 1062; *Intre Sport*, 625 F.Supp. at 1310. "Failure to plead compliance with the statute of limitations requires dismissal without prejudice to replead." *Chaus*, 801 F.Supp. at 1269; *accord Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 552 (S.D.N.Y.1977).

██ In the numerous complaints at issue here, the Plaintiffs have consistently failed to specify their dates of purchase, in some cases simply alleging that Plaintiffs' investments

---

**9.** On June 15, 1989, Integrated announced that it was imposing a debt moratorium and suspending all payments on its commercial paper and other short-term debt totaling $1,500,000,000.00 This was the first failure of a Drexel-backed "junk bond" and only the second default on commercial paper since Manville defaulted in the early 1970's.

The press was quick to respond to news of Integrated's default. On June 15, 1989, most of the major wire services including the Associated Press ("AP") and Reuters carried stories on Integrated's debt moratorium. On June 16, 1989, *The New York Times, Wall Street Journal, Los Angeles Times, Newsday* and others all printed prominent stories on Integrated's default. These

stories not only reported Integrated's debt moratorium but also discussed in detail the cash flow and debt problems that plunged the company into a liquidity crisis. In the days that followed, major news sources continued to report on Integrated's declining stock and bond prices, falling bond ratings and attempts to restructure its mountain of debt.

Throughout June and the summer of 1989, numerous stories continued to appear in *The New York Times* and *Wall Street Journal* reporting Integrated's struggle to refinance its debt burden in order remain viable. In the same time period, nearly every major newspaper in the United States reported on Integrated's default and related troubles.

occurred "after" a certain date. Thus, each is defective insofar as it fails to plead compliance with the relevant statutes of limitations.

The Defendants have provided comprehensive schedules setting forth the purchase dates for the various Partnerships. In light of the fact that the Defendants do not dispute these dates,[10] these dates are accepted as the relevant dates in determining the issue of compliance with the statute of limitations, thereby obviating the need to dismiss the Complaints with leave to replead and suffer the delay that such a disposition would necessitate.

III. Applying the Statutes of Limitations

Five of the complaints have been amended to add more plaintiffs: *Fillmore/Greene's*,[11] *Clovine/Standefer*,[12] *West Palm/Coleman*,[13] *Hunter Publishing*,[14] and *Southern Inns*[15]. The Anderson Kill Defendants allege that all new Plaintiffs and Defendants are barred because they fail to relate back to the original complaints according to the requirements of Rule 15(c), Fed.R.Civ.P., which governs the "relation back" of amendments to the original pleadings.

**10.** The one exception is *Fillmore/Enviro* which is discussed *infra*.

**11.** The Plaintiffs added in the Amended Complaint are the following: Tuf Labs Inc., Durane Gas Co., Thomas Liv. Trust, Gary & Carolyn Bream, McNamara Pontiac Inc., Duard & Marlene Morris, C.T. Fowler Inc., Bar–Tak Importers Inc., and Snowhill Investments.

**12.** The Plaintiffs added in the Amended Complaint are the following: James Berger, Thomas McKearn, John Pullen, Justin Stone, Carl La Manna, Joseph Kirk, Alex Knezevich, Robert Zimmerman, Kenneth & Mary Lovelace, Peter McIver, Heights Building Co., Thomas Bryant, Barry Kraynack, Steven Cady, John Dunbar, III, Estate of Robert Gunn, Bernard Bacevich, John Robinson, Charles Munn, William Foster, Howard Steahly, Kenneth Monnin, George & Louise Sousa, Fred Schunmann, Michael Rozen, Donald Williams, Stephen Autry, Ron Arrick, and Jack Zigler.

**13.** The five new Plaintiffs added in the Amended Complaint are the following: Robert & Wendy Lembersky, Maurice & Barbara Morin, and John Jory.

**14.** The Plaintiffs added in the First and Second Amended Complaints in *Hunter* are the follow-

## A. Certain Plaintiffs' Claims Relate Back

Although the language of Rule 15(c) does not explicitly govern the relation back of amendments changing or adding plaintiffs, the Advisory Committee Notes to the 1966 amendment to the Rule state that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." Additional plaintiffs may be added provided there was both notice to the defendants of the existence of the additional claim and a mistake in the original pleading as to the proper party. *See Morin v. Trupin*, 778 F.Supp. 711, 734 (S.D.N.Y.1991) ("*Morin II* "); *Adler v. Berg Harmon Assocs.*, 790 F.Supp. 1235, 1239 (S.D.N.Y.1992); 6 Wright, Miller & Kane, 6A *Federal Practice and Procedure* § 1501 at 154 (1990).

Rule 15(c), in effect at the time of the filing of the Amended Complaint in *Hunter Publishing* (filed September 9, 1991, adding forty-four plaintiffs) and of the filing of the first two Amended Complaints in *Southern Inns*

ing: Angellina Harwood Sales Co. Inc., T. Cass Ballenger, Louis & Sandra Bonessa, Janice Carson, Louie Davis, Sydney Falk, J. Thomas Foster, Marilyn Gallagher, Gerald Garbacz, Peter Gelzinis, Jr., Vito & Lucreza Gentile, Jeffery Goldberg, Jeffery Goldberg, Esq., Nihal Gooneratne, P. Guniganti, Richard Guth, C.T. Holland, Carroll Johnson, William Kent, Michael King Assoc. Retirement Trust, Barry Kraynack, Ursula Kroettinger, Martin Loon, Jerald & Joan Mahanke, Margaret McComb, Martin Meyers, Maurice & Barbara Morin, Ronald Park, Randy Price, John Pullen, Clifford Raisbelk, John Saathoff, Scott Santerre, Baldwin Sawyer, Jareen Schmidt, Richard Scott, Robert Slater, Harriet Smith, Ronald Smith, Haze Varner, Wadsworth Golf Constr. Co. Trust, Wadsworth Golf Constr. Co., James Wilson, and Kenneth Moorhead.

**15.** The *Southern Inns* Plaintiffs added by the First and Second Amended Complaints are the following: Joan Agurcia, Rhona Miller, Mary Walker, Bhurji Singh, J. Lee & Phyllis Bailey, Donald Litzenberger Trust, Jesse Fox, James Thompson, John Lucania, Meyer Mann, Robert Evans, D. Wesley Huggins, III, Claudia Roach, Joseph Adlon, Richard Henrietta House, Rev. Eliz. J. Walker Trust, James Weldon, and DeWest Hooker. Louis Black and Barry Kraynack (misidentified as "Barry Kraymark" in the Complaint) were added as Plaintiffs in the Third Amended Complaint.

(filed November 16, 1990, adding eleven new plaintiffs, and January 7, 1991, adding seven plaintiffs), provided that:

An amendment changing the party against whom a claim is asserted relates back if ... within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party the action would have been brought against him.

Fed.R.Civ.P., Rule 15(c) (1988).

On December 19, 1991, the Plaintiffs filed amended pleadings in five of the pending actions to add additional plaintiffs (*Fillmore/Greene's*, adding nine plaintiffs, *Clovine/Standefer*, adding twenty-nine plaintiffs, *West Palm/Coleman*, adding three plaintiffs, *Hunter Publishing*, adding one plaintiff, and *Southern Inns*, adding two plaintiffs). These are governed by Rule 15(c) as amended.[16]

▮ However, the Plaintiffs may not add new plaintiffs to any action after June 19, 1991, the date laid down in § 27A. Relation back must be permitted by the statute of limitations. "Plaintiffs who joined this action by Amendments [dated after June 19, 1991] are not entitled to ... reinstatement under

Section 27A. The plain language of the statute permits ... only ... claims commenced prior to June 20, 1991 and dismissed pursuant to *Lampf* and *Beam*. [T]he Court disagrees with plaintiffs' argument that the claims of the post-*Lampf* plaintiffs relate back to the date of the filing of the original Complaint in 1989." *Adler*, 790 F.Supp. at 1238. Therefore, only the plaintiffs added prior to June 20, 1991, namely, the First and Second Amended Complaints in *Southern Inns*, may be permitted, and then only if these plaintiffs satisfy the two prongs of Rule 15(c): Notice to the defendants sufficient to prevent prejudice to their defense, and some form of mistake concerning the identity of the proper party.

In *Morin II*, 778 F.Supp. at 733–35, additional plaintiffs (added through a consolidation of actions) were barred for two reasons. The first was that cited above, namely, that to consolidate untimely actions with timely ones "totally defies the reasoning and import of *Lampf.*" *Id.* at 734. The second was that the amended complaint did not satisfy the notice prong since the original complaint "contained no like intimation of a greater universe of possible plaintiffs." *Id.* This Court distinguished *Nielsen v. Professional Financial Management, Ltd.*, 682 F.Supp. 429 (D.Minn.1987) (following *Stoppelman v. Owens*, 580 F.Supp. 944 (D.C.Cir.1983)),

---

16. Rule 15(c) as amended and in effect after December 1, 1991, applies to the Amended Complaints if:

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

. . . . .

(3) the amendment changes the party of the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (a) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P., Rule 15(c) (as amended Apr. 30, 1991, eff. Dec. 1, 1991; Dec. 9, 1991, Pub.L. 102–198, § 11(a), 105 Stat. 1626.) (The period provided by Fed.R.Civ.P., Rule 4(j) is 120 days.) Lower courts have disagreed as to whether "the period provided by law for commencing the action" included the time available for service pursuant to the Federal Rules. 3 *Moore's Federal Pract.* 15.15[4.–2] at 15–159 (1992) (collecting cases). In *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), the supreme Court held it did not. Congress amended Rule 15(c) after the Advisory Committee labeled the result in *Schiavone* inconsistent with the liberal pleading practice provided for by Rule 8, Fed.R.Civ.P. *See* Notes of the Advisory Committee on Rules, Notes to the 1991 Amendment to Rule 15(c), Committee Note of 1991 to Rule 15(c), *reprinted in Moore's, supra*, 15.01[13] at 15–10.3 (1992). The amendment does not help the Plaintiffs, since the new Defendants are added in the amended complaint dated December 19, 1991, which is obviously more than 120 days after any prior pleading.

Rule 15(c) as amended applies prospectively, but it may be applied retrospectively by a district court in the exercise of its discretion. *Boliden Metech, Inc. v. U.S.*, 140 F.R.D. 254 (D.R.I.1991).

which had permitted additional limited partners otherwise time-barred to be added as plaintiffs in a similar action, based on identity of interest and the fact that the original timely complaint in *Nielsen* had stated that "plaintiffs are one [sic] of several hundred Energy Brain investors nationwide and one [sic] of several investors in this district." *Nielsen*, 682 F.Supp. at 435, *quoted in Morin II*, 778 F.Supp. at 735. In *Stoppelman*, the court held that the untimely claims of other limited partners could be permitted because the original action put the defendants on notice. *See* 580 F.Supp. at 946.

■ The notice contemplated by Rule 15(c) is related to the idea of mistake. It must be clear to the Court that the late action is not a deliberate device to circumvent the statute of limitations. As this Court stated in *Morin II*, "[s]ubsection (2) makes clear that Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff of whom a defendant may be aware. Rather, Rule 15(c) stands as a device of adding a party who 'but for a mistake concerning the identity of the proper party' would have been named originally." 778 F.Supp. at 735; *accord, Adler*, 790 F.Supp. at 1239 (eliminating additional plaintiffs whose claims were added after deadline of June 19, 1991 in § 27A). But *Morin* concerned consolidated actions which were not only not governed by Rule 15(c) but also clearly failed the notice prong. Because defendants could easily believe that they were not named in the original *Morin* action as a deliberate tactical matter, they would not be on notice that they would be named in the future. The distinction is between the plaintiffs' strategy or lack of due diligence and their honest error.

■ "In view of the history of the application of Rule 15(c), the phrase 'a mistake concerning the identity of the proper party' should clearly not be read to limit its usefulness to cases of misnomer." 3 *Moore's Federal Practice* ¶ 15–15[4.–2] at 15–167, n. 19 (1992). "The 'mistake' condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than a deliberate strategy." *Advanced Pow-*

*er Sys., Inc. v. Hi–Tech Sys., Inc.*, 801 F.Supp. 1450 (E.D.Pa.1992). Here the Defendants were on notice of the lawsuit from the time of the original complaint. "The addition of the other Plaintiffs did not bring any new claims into the action. The purpose behind the statute of limitations, namely notice, is not defeated in this action by permitting the amended complaint to relate back." *Stoppelman*, 580 F.Supp. at 947. As long as the original complaint gives the defendant adequate notice, an amendment relating back is proper even if it exposes defendants to greater damages. Wright, Miller & Kane, supra § 1501 at 162. In the matter at hand, unlike the plaintiffs in *Morin*, the additional Plaintiffs in the first two amended complaints come directly within the holding of *Stoppelman*, 580 F.Supp. at 947.

Therefore, the §§ 10(b) and 12(2) claims of the Plaintiffs added in the Amended Complaint in *Fillmore/Greene's*, the Amended Complaint in *Clovine/Standefer*, the Amended Complaint in *West Palm/Coleman*, the First and Second Amended Complaints in *Hunter Publishing*, and the Third Amended Complaint in *Southern Inns* are dismissed and the Moving Defendants' motion for summary judgment against these Plaintiffs' claims is granted. However, the §§ 10(b) and 12(2) claims of the Plaintiffs added in the First and Second Amended Complaints in *Southern Inns* do relate back to the original Complaint and survive this aspect of the Global Motion I.

### B. Plaintiffs' Claims Do Not Relate Back To Include New Defendants

The logic in *Adler* extends to defendants as well, since if the date of § 27A is an absolute bar, it should bar both plaintiffs and defendants. Although *Adler* concerned only plaintiffs, there seems no reason not to follow it where the amendment adding defendants was filed December 19, 1991, an even six months after the effective cutoff date. However, the additional defendants are barred by more than an extension of the recent decision in *Adler*.

■ Since Rule 15(c) applies by its terms to defendants, the relation back analysis is

the same. The new Defendants in *Southern Inns* have been added by the Third Amended Complaint filed December 19, 1991, over a year after the original Complaint was filed (in October 1990).[17] These Defendants have been added more than three years after the alleged fraudulent purchases by some of the Plaintiffs, and more than one year after all of the Plaintiffs were put on "inquiry notice" of the alleged fraud. "Where a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Northwestern Nat. Ins. Inc. v. Alberts,* 769 F.Supp. 498, 510 (S.D.N.Y.1991) (citing *Schiavone,* 477 U.S. at 25–32, 106 S.Ct. at 2382–85). But *Schiavone* allowed a claim otherwise barred by the statute of limitations to name a defendant only if that defendant had notice: "Timely filing of a complaint, and notice within limitations period to the party named in the complaint, permit imputations of notice to a subsequently named and sufficiently related party.... The linchpin is notice, and notice within the applicable limitations period." *Id.* at 29, 31, 106 S.Ct. at 2384, 2385.

█ The Plaintiffs allege that the new Defendants are "the individuals who own and direct and control the activities of the defendant entities, including the general partners," and that "the identity of interests between the original and the newly added defendants is complete." Pls.' Mem. in Opp. at 116. The sole specific example of the new Defendants' identity of interests with the prior Defendants is the fact that the newly added Defendants are represented by the same counsel. *Id.* The Plaintiffs do not state whether the new defendants were always represented by the same counsel, or whether they acquired the services of the same counsel after the original Complaint was served.

The Complaint itself is more specific. It alleges that Selig Zises was the Chairman of the Board of Directors and CEO of Integrated Resources; that his brother Jay Zises was Vice Chairman of the Board of Directors;

that they and their immediate family owned 12% of the outstanding stock of Integrated Resources; and that "through such ownership exercised effective control over Integrated Resources and all of its subsidiaries." Compl. ¶ 7. The other eight personal Defendants are all alleged to have been officers and directors of Integrated Resources, EVP, and Sevzar at the time of the allegedly fraudulent events, and to have overseen the purchases and operations of the partnership. The two remaining Defendants are Zar Corporation and EVP Sixth Corporation, both corporate general partners. The Complaint gives the full corporate title and positions of each of the named Defendants.

The Supreme Court noted in *Schiavone,* 477 U.S. at 29, 106 S.Ct. at 2384, that for newly added defendants:

> Relation back is dependent upon four factors, all of which must be satisfied: (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Id.* at 31, 106 S.Ct. at 2385. The last requirement has been modified by the amendment to Rule 15(c). *See supra* note 16. The Court in *Schiavone* declined to decide whether or not to accept the "identity of interest" exception to this rule:

> Some Courts of Appeals have recognized an "identity-of-interest" exception under which an amendment that substitutes a party in a complaint after the limitations period has expired will related back to the date of the filing or the original complaint.... Even if we were to adopt the identity-of-interest exception, and even if Fortune properly could be named as a defendant, we would be compelled to reject

17. The new Defendants are: Richard H. Ader, Jay D. Chazanoff, Arthur H. Goldberg, Selig A. Zises, Jay H. Zises, Gary W. Krat, Philip H. Cohen, Joel M. Pashcow, Daniel N. Davis, Benjamin D. Fein, Zar Corp., and EVP Sixth Corp.

petitioners' contention that the facts of this case fall within the exception.

*Schiavone,* 477 U.S. at 28, 29, 106 S.Ct. at 2383, 2384. Since the specific ground for the Plaintiffs' claim that the allegations against the new Defendants relate back to the original Complaint is the new Defendants' alleged identity of interest with the existing Defendants, this ground will be considered below.

The classic definition of the identity of interest exception is in *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 102–03 (1st Cir.1979):

> The identity of interests concept, a judicial gloss on Rule 15(c)(1), provides that the institution of the action serves as constructive notice of the action to the parties added after the limitations period expired, when the original and added parties are so closely related in business of other activities that it is fair to presume the added parties learned of the institution of the actions shortly after it was commenced.... The identity of interest principle is often applied where the original and added parties are a parent corporation and its wholly owned subsidiary, two related corporations whose officers, directors, or shareholders are substantially identical and who have similar names or share office space, past and present forms of the same enterprise, or co-executors of an estate.

*Id.* at 102–03. In the Second Circuit, "[c]ourts have generally held that Rule 15(c) is satisfied where the original party and added party have a close identity of interests.... [I]dentity of interests has also served as touchstone for determining whether the new party knew or should have known that 'but for' a mistake in identity, he would have been sued in the first instance." *Sounds Express Int'l Ltd. v. American Themes and Tapes, Inc.,* 101 F.R.D. 694, 697 (S.D.N.Y.1984). The Second Circuit, following *Schiavone,* has analyzed the exception as if it did apply. *See In re Allbrand Appliance & Television Co.,* 875 F.2d 1021, 1025 ("We

assume for purposes of this discussion that an identity of interest exception exists.").

Analyzed under in *Allbrand,* the Plaintiffs' Second Amended Complaint here relates back neither to the corporate general partners nor to the individual defendants. "Courts accepting that rationale [identity of interest] have required substantial structural and corporate identity, such as shared organizers, officers, directors, and offices." *Id.* at 1025. The Plaintiffs have alleged that Zar Corporation is a wholly-owned subsidiary of Integrated. *See Southern Inns* 2d Am. Compl. ¶ 5. Complete ownership by itself does not suffice to relate the claims back to Zar Corporation. In *Allbrand,* in which a wholly-owned subsidiary was served in place of its corporate parent in a case almost factually identical to *Schiavone,*[18] "the parent-subsidiary relationship standing alone is simply not enough—as Professors Wright and Miller perhaps too optimistically state ...— to establish the identity of interest exception to the relation back rule. Greater identity of interest must be shown than this record reveals." *Allbrand,* 875 F.2d at 1025. The Seventh Circuit has distinguished *Allbrand* from a mere "misnomer" case, when it allowed a complaint that incorrectly named only the trademark but was correctly served on the corporation's legal agent for service of process to relate back:

> [O]ur case does not differ from a misnomer.... *Allbrand Appliance* is based on the principle that the corporate form must be respected. Corporations are not agents of their stockholders (their "parents"). Nothing in our opinion calls this principle into question. The notice in this case came to C.T. Corporation, which unlike a subsidiary was unquestionably Seal Air's agent for the purpose of receiving process. The decisions do not conflict.

*Peterson v. Sealed Air Corp.,* 902 F.2d 1232, 1237–38 (7th Cir.1990). Ownership alone is not enough. Service upon a subsidiary, without more, is not service upon the parent corporation.

---

**18.** It should be noted that while the logic of *Allbrand* is still good law, the precise holding is no longer valid: Now, when the correct corporate defendant is served with the complaint beyond statute of limitations but within 120 days of filing against a corporate division with no independent legal existence, the true corporate defendant has been served within the statute of limitations. *Schiavone* and *Allbrand* have been modified only to this extent. *See supra* note 16.

For the other new corporate Defendant, the Plaintiffs have only alleged that EVP Sixth Corporation is wholly owned and controlled by five of the individual defendants. Since the Plaintiffs have failed to show that the complaint relates back to the individual Defendants, this claim too must be denied.

■ The notice requirement for the individual Defendants is crucial. "The conclusion of a growing number of courts and commentators is that sufficient notice may be deemed to have occurred where a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." *Kinnally v. Bell of Pennsylvania*, 748 F.Supp. 1136, 1141 (E.D.Pa.1990). The notice has to be such that the new defendant must be able to anticipate and therefore prepare for his role as a defendant. Plaintiffs rely on a case from the Federal Circuit, *Fromson v. Citiplate, Inc.*, 886 F.2d 1300 (Fed.Cir.1989), for the proposition that they may hold individual officers liable, since the court in *Fromson* found "corporate officers and directors personally liable for 'participating in, inducing, and approving acts of patent infringement' by a corporation." *Id.* at 1304. There, however, the Court permitted the complaint to relate back to two defendants who were both founders, sole owners, and sole directors of the defendant corporation in a situation where the plaintiff had alleged both adequate notice and mistake. On the facts in that case, the two defendants "could not have been surprised when Fromson moved before trial to add them as defendants," and, since they themselves had resisted that motion "on the basis of false assurances that Citiplate was solvent," they "themselves created the 'mistake' respecting the identity of the proper party rightfully to be sued and capable of responding in damages." *Id.* at 1304.

The case relied on by *Fromson*, in turn, was also based on "general principles relating to piercing the corporate veil." In *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed.Cir.1986), the court imposed liability on a defendant who "was at all material times the President and sole stockholder" of one defendant corporation and, together with two other principals, held all of the directorships and owned all of the stock in the other defendant corporation. *Id.* at 1579, cited in *Fromson*, 886 F.2d at 1304. Other situations in which the plaintiffs were allowed to relate their claims back contain similar allegations that the named defendants were the only real parties in interest. An untimely amended complaint related back where it named as defendant the president who owned 97% of the defendant corporation, *see Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1258 (11th Cir.1983), or where it named two former employees, founders and principals of a new company, in an action which alleged the new company had stolen trade secrets from its principals' former employer, *see Advanced Power Sys.*, 801 F.Supp. at 1450. The 12% ownership alleged by Plaintiffs here usually is not considered a controlling share, and none of the cases cited by the Plaintiffs make corporate officers or directors personally responsible based solely on holding their office.

For new defendants as well as new plaintiffs, the notice prong of Rule 15(c) is intertwined with the element of mistake. Unless the plaintiffs can allege a specific reason why they failed to identify these corporate officers in the original complaint, an officer will not expect to be sued personally for the sins of the corporation and so will have no true notice of the lawsuit within the meaning of Rule 15(c). 3 *Moore's Federal Practice* ¶ 15.-15[4.–2], at 15–120 & n. 22 (1992). Therefore, even in situations where the courts have found an "identity of interest" between the corporate officer and the corporation, or between two corporations, the new defendant suffers prejudice unless the plaintiff alleges a reason for the mistake.

In cases where the plaintiff has attempted to relate an amended pleading back to name corporate officers solely by virtue of their position, the relation back has been denied. In *Hashim v. First National Bank of Chicago*, No. 86 C 2696, 1992 U.S.Dist. LEXIS 5686 (N.D.Ill. Apr. 17, 1992), the district court denied the plaintiffs' motion for leave to amend the complaint to include a bank officer and an advisor of a bank-sponsored

commercial real estate investment, finding that:

> [t]he record reveals that Hashim dealt with both Anderson [President and Managing Director of defendant corporation] and Herbert [member of defendant bank's Trust Committee having a "supervisory capacity" with respect to certain trust assets] while at First Chicago. He knew who they were and therefore could have sued them at the time [of] the original complaint.

1992 U.S.Dist. LEXIS 5686, at *29. Mistake must be alleged even when one corporation is substituted for the other, if they are separate legal entities and plaintiff at the time of the original complaint knew of the existence and role of the second.

> Plaintiff was notified in March 1975, prior both to the filing of her first two complaints and the expiration of the limitations statute, that TRW manufactured the steering gear mechanism; yet, she named only International Harvester and its insurer as defendants in her complaints. Moreover, plaintiff has never alleged that she made a mistake or has offered an explanation for her three-year delay in naming TRW as a defendant.

*Norton v. International Harvester Co.*, 627 F.2d 18, 22 (7th Cir.1980). A firm or an individual may receive notice that the lawsuit exists (Rule 15(c)(1)) without recognizing itself as the proper defendant and so without knowledge that it would be sued (Rule (15)(c)(2)), just as a firm or individual may be the proper party without receiving any notice at all. The former is as thoroughly barred by Rule 15(c) as the latter. Here the Plaintiffs have alleged no reason or mistake which could explain why they failed to name the new defendants in the first place.

To support their claim of "identity of interest" between the new and the prior Defendants, the Plaintiffs allege that the new Defendants share counsel with prior Defendants. Shared counsel, without more, is not determinative, and plaintiffs have not alleged that the new Defendants were represented by the same counsel at the time the original complaint was filed. *See Wood v. Worachek*, 618 F.2d 1225, 1230 (7th Cir.1980); *Miles v. Department of Army*, 881 F.2d 777 (9th Cir.

1989). Even if they had, this by itself would not be enough in the Second Circuit. In *Allbrand*, where both defendants shared counsel throughout the relevant time period, "appellant makes much of the shared legal counsel and parses Heveran's role as Caloric's counsel into something more than it really was. Consequently, we conclude the identity of interest exception may not be used to impute to Raytheon the timely service of pleadings made on its subsidiary Caloric." *Allbrand*, 875 F.2d at 1026.

Alleging that the new Defendants were all on notice merely because they were somehow involved in the limited partnerships does not rise to the level of notice. The Plaintiffs did nothing to indicate to the separate and distinct new groups of defendants that they intended to include them. *Gleason v. McBride*, 869 F.2d 688, 694 (2nd Cir.1989). Adding control persons and other partners to the existing Defendants is not a mistake of the kind Rule 15(c) contemplates. *Curry v. Johns–Manville Corp.*, 93 F.R.D. 623, 626–27 (E.D.Pa.1982).

### C. *The Complaints Barred by "Ceres"*

■ Four of the complaints are clearly barred by *Ceres: Research Triangle, 600 Grant Street/Reagan, Clovine/Standefer,* and *Clovine/Ellingson.* All four allege an act of fraud based on omissions and representations and transaction loss from sales which could at the very latest have taken place in 1986. All four lawsuits were filed in 1991, more than four years thereafter. Applying *Ceres'* limitation against § 10(b) actions brought more than three years from the date of the fraud, and § 13 statutory ban against § 12(2) actions brought more than three years from the date of the fraud, all plaintiffs' actions in these suits are time-barred.

■ A fifth claim is apparently barred by *Ceres*, although it is difficult to tell from the facts pleaded by the Plaintiff whether the claim is effectively barred or not. In *Fillmore/Enviro* (offered by a private placement memorandum dated January 11, 1988) the Plaintiffs allege they purchased their interests from February 11, 1988 through "mid-March 1988." The Moving Defendants, on

the other hand, maintain that all interests were purchased on February 16, 1988. However, there is only one Plaintiff in *Fillmore/Enviro* (the Enviro Corporation) and that Plaintiff has not offered any evidence to refute the February 16, 1988 date of purchase.[19]

The Complaint in *Fillmore/Enviro* was filed in the Southern District of New York on March 7, 1991, and so the statute of limitations is that laid down by *Ceres*. All claims arising out of interests purchased by March 7, 1988 in this case are time-barred. The date of purchase is the date the subscription agreements evidencing an interest in the partnerships were executed for both § 10(b) and § 12(2) claims. It is not the date that the Plaintiffs received notification that they were accepted into the Partnership. *Marlow v. Gold*, 1991 Fed.Sec.L.Rep. (CCH) ¶ 96,112, at p. 90,633, 1991 WL 107268 (S.D.N.Y. June 13, 1991); *Maxwell v. LaBrunerie*, 731 F.Supp. 358, 362–63 (W.D.Mo.1989); *Amoroso v. Southwest Drilling Multi–Rig Partnership No. 1*, 646 F.Supp. 141 (N.D.Cal.1986). The three-year limitation is an absolute. *Farley v. Baird, Patrick & Co.*, 750 F.Supp. 1209, 1214 (S.D.N.Y.1990).

### D. *Pre–Ceres Actions: Lenox Towers and Southern Inns*

■ Two of the cases filed in New York are not governed by *Ceres: Lenox Towers* and *Southern Inns*. Those actions were commenced just prior to the Second Circuit's decision in *Ceres*. Because this Court has held above that § 27A of the 1934 Act is constitutionally valid, the statute of limitations set forth in *Ceres* does not apply retroactively to the pending § 10(b) claims in these two cases. Under pre-*Ceres* law, the applicable statute of limitations would be either the forum state's most analogous state law claim statute of limitations or the most analogous state law claim under New York's "borrowing statute," whichever is shorter. *See Armstrong*, 699 F.2d at 87; *Arneil*, 550 F.2d at 779–80; *Morin III*, 799 F.Supp. at 345. In the case of plaintiffs who were resi-

dents of New York State at the time of the injury, N.Y.Civ.Prac.L.R. § 213(8) (McKinney 1990 Supp.) applies: The action must be commenced within six years of the commission of the alleged fraud or two years from the time the alleged wrongdoing was, or with reasonable diligence should have been, discovered. For plaintiffs who were nonresidents at the time, New York's "borrowing statute," N.Y.Civ.Prac.L. & R. § 202 (McKinney 1990 Supp.), applies.

The law of New York applies to the Plaintiffs in *Lenox Towers*. However, since the relevant Plaintiffs in *Southern Inns* live in Alabama, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Maryland, Missouri, Mississippi, North Carolina, New Jersey, Pennsylvania, and Tennessee, it is necessary to identify the statute of limitations which would be applied by district courts sitting in these states in order to determine the timeliness of the various § 10(b) claims. In both cases, the timeliness of all of the § 12(2) claims is governed by the one year/three year limitations set forth in the 1933 Act.

#### 1. Lenox Towers

The Lenox Towers Associates Limited Partnership, which was syndicated on February 15, 1989, was set up to acquire and manage two office buildings in Atlanta, Georgia. The Plaintiffs purchased their units in the Partnership between June 1988 and January 1988, and they filed their original Complaint on November 2, 1990.

##### a. *Section 10(b) Claims Survive*

■ Under New York's six-year statute of limitations, the Plaintiffs' § 10(b) claims in *Lenox Towers* are timely and survive this motion to dismiss.

##### b. *Section 12(2) Claims Survive*

Although the Plaintiffs' § 12(2) claims fall within the three-year outer limit of the 1933 Act's statute of limitations, it remains to be determined whether these claims are time-barred under the "within one year of discov-

---

19. *Fillmore/Enviro* is also time-barred by the Plaintiffs' failure to satisfy the "one year from

discovery" statute of limitations. *See infra* n. 21.

ery" limitation. 15 U.S.C. § 77m (1991). The question, then, is this: When did the Plaintiffs have actual knowledge or when were they placed on inquiry notice regarding the probability of the fraud they now allege in their Complaint?

The thrust of the securities fraud claims in the *Lenox Towers* action is that the subject private placement offering memorandum misrepresented and failed to disclose the possibility that the limited partnership units being offered would not completely sell out, and that the Partnership might borrow the resulting shortfall from outside lenders. Specifically, the Complaint alleges that:

> The Memorandum and investment summary ... were drafted to lead plaintiffs and the class to believe that $15,345,000 of capital contributions [*i.e.* the full amount of the offering] would be obtained from the syndication. Thus, for example, the investment summary contained an illustration of economic benefits of investing in one unit of the Partnership as though all of the units would be sold. The Memorandum, in the very first page, stated the offering was for $15,345,000.

*Lenox Towers* Compl. ¶ 19.

██ The Complaint continues with a recitation of other sections in the PPM, all of which the Complaint alleges led the Plaintiffs mistakenly to believe that the offering would completely sell out. These sections include the "pro forma allocation of capital contribution," the "illustration of the hypothetical economic benefits" to an investor, and the "illustration of the economic consequences of a hypothetical sale of the properties." *Id.*

However, the Lenox Towers PPM unambiguously did disclose, in capitalized type on page ii, that the offering might be undersubscribed and specifically indicated that the Partnership retained the option of borrowing the shortfall:

> THE PARTNERSHIP MAY IN THE FUTURE BE REQUIRED TO BORROW ADDITIONAL AMOUNTS SUFFICIENT TO ENABLE THE PARTNERSHIP TO PAY CERTAIN OF ITS OBLIGATIONS THAT HAVE OR WILL BECOME DUE BEFORE THE PARTNERSHIP RECEIVES THE PROCEEDS OF THIS OFFERING. TO THE EXTENT THAT THE UNITS OFFERED HEREBY REMAIN UNSOLD, A PORTION OF SUCH BORROWINGS WILL REMAIN OUTSTANDING.

Lenox Towers PPM at ii.

In addressing this same issue of disclosure in the Lenox Towers PPM, Judge Stanton found, in *Martin v. EVP Second Corp.*, No. 90 Civ. 7074 (LLS), 1991 WL 131176, *1, 1991 U.S.Dist. LEXIS 9234, *3 (S.D.N.Y. July 9, 1991), that the Memorandum "warned three times that if investor interests remain unsold, the partnership might have to rely on borrowed capital." However, despite these warnings, the Court went on to conclude that the Defendants failed to disclose "the allegedly material fact that in the recent past, similar investments syndicated by the same entities had failed to sell out." *Id.* Therefore, if the Plaintiffs' claim that the Defendants had failed to inform the Plaintiffs that previous limited partnership offerings had failed to sell out proved to be true, the Plaintiffs had pleaded a material omission sufficient to withstand a motion to dismiss.

In *Martin*, Judge Stanton considered the adequacy of the offering materials in question within the context of a motion brought by the Integrated Defendants to dismiss the Plaintiffs' Complaint pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P. The Integrated Defendants did not raise the question of the timeliness of the §§ 10(b) and 12(2) claims, nor did Judge Stanton explicitly address that issue. However, his holding regarding the omission of an allegedly material fact from the offering materials is directly relevant to the present issue of whether the Plaintiffs were placed on inquiry notice by those materials of the fraud they now allege in their First Amended Complaint.

The holding in *Martin* is the law of this particular case, and as such, it controls the disposition of the Global Motion I as it relates to the timeliness of the Complaint filed in *Lenox Towers*. Therefore, to the extent *Martin* holds that the offering materials omitted a material fact regarding the unsold units of prior partnerships—a fact which now serves as the basis of the § 12(2) claims of

the *Lenox Towers* Plaintiffs, those Plaintiffs were not placed on inquiry notice by the PPM, and their § 12(2) claims are not time-barred under § 13 of the 1933 Act.

### 2. Southern Inns

The Southern Inns Associates Limited Partnership, which was syndicated on June 10, 1988, had acquired and was set up to operate seven Comfort Inns motels located in Charlotte, Raleigh, and Winston–Salem, North Carolina, Greenville, South Carolina, and Richmond, Virginia. The Plaintiffs purchased their units in the Partnership between June 1988 and January 1988, and they filed their action against the Defendants in this case on October 19, 1990.

Like the allegations made in *Lenox Towers,* the *Southern Inns* Complaint asserts securities fraud claims that are grounded on a purportedly defective private placement offering .memorandum. The defects are alleged to be certain misrepresentations made by the Defendants and the Defendants' failure to disclose the possibility that the limited partnership units being offered would not completely sell out and that, in the event any units remained unsold, the Partnership might borrow from outside lenders to cover the resulting shortfall. *See Southern Inns* 3d Am.Compl. ¶¶ 13, 14, 16–18. The Plaintiffs also allege that the *pro forma* balance sheet and other sections in the PPM were fraudulent because they were based upon the presumed sale of all of the limited partnership units. *Id.* at ¶ 12.

However, like the Lenox Towers PPM, the Southern Inns PPM disclosed that the respective offerings might not sell out and that the Partnership might borrow the shortfall. The PPM expressly stated that:

> In the event that not all of the Interests are sold to investors in the Offering, it is anticipated that the General Partner or one of its Affiliates will purchase such Interests for its own account at the same purchase price (less selling commissions) as charged to Investors and that it will hold such Interests as a Limited Partner.... The General Partner or its desig-

nee may, in the alternative, lend to the Partnership from time to time an amount equal to the aggregate purchase price (net of selling commissions) of all unsold Interests, including the interest payment on the deferred portion of such purchase price, in exchange for the Partnership's promissory note(s).

Southern Inns PPM at 140.

In light of the warnings in the PPM regarding the possibility that the offering may not sell out and the well-known status of the Defendants as organizers of similar limited-partnership ventures, the reasonable investor [20] would inquire about the success of recent offerings that the Defendants had conducted that were similar to the one the investor was presently considering. This is not a case where the investor would have had to check the brokerage registration of a company, the validity of its corporate articles, or the chain of title to the properties in order to discover the misstatements. It was no secret that Integrated was in the business of syndicating investment vehicles. Large sections of at least several of the partnership PPMs revealed the financial status, including bankruptcies, of Integrated-sponsored partnerships.

The rule set forth here is consistent with the Second Circuit law on inquiry notice, which requires the imputation of constructive knowledge of the probability of the alleged fraud before the statute of limitations is triggered but does not require actual knowledge of the fraud and is hostile to the notion that the plaintiff be allowed "leisurely discovery of the full details of the alleged scheme." *Klein,* 421 F.2d at 343. However, it is just this sort of "leisurely discovery" that is implicitly tolerated by the finding in *Martin* that the failure to disclose unsold units in other partnerships constituted an omission of a material fact. On this view, the reasonable investor would be relieved from any duty to make even the most obvious of inquiries regarding the track record of the parties with whom he is dealing. It is such inquires that the reasonable investor would make and is in a position to make when discussing his in-

---

**20.** Recall that the Plaintiffs had to qualify as "accredited investors" to participate in this offer- ing pursuant to Reg. D. *See* 1933 Act, Rule 501(a), 17 C.F.R. 230.501(a).

vestment in the partnership with the syndicators and general partners at the time of the offering.

The contradiction between the disclosure of the possibility of an undersubscribed offering and the alleged misrepresentations in the offering materials that all of the units would be sold, could have been discerned readily by a reasonable investor reading the PPM prior to investing. This apparent contradiction on the face of the PPM placed the Plaintiffs on inquiry notice of the probability of the fraud alleged in their Complaint from the date they purchased investment units in the Partnership.

The publicity concerning Integrated's financial collapse commencing in June 1989 also put the Plaintiffs on inquiry notice of the alleged misrepresentations respecting Integrated's financial wherewithal. *See Southern Inns* Compl. ¶¶ 15, 17, 18. Indeed, the June 1989 publicity put the Plaintiffs on notice of not only their fraud claims relating to Integrated's financial condition but also of their claim based on the failure to sell all of the units. The alleged misrepresentations and omissions regarding Integrated's financial stability are central to the fraud claims concerning the incomplete sale as they are set forth in the Plaintiffs' Complaint.

Therefore, if, as the Plaintiffs allege, the *pro forma* and other provisions regarding the Southern Inns investment were misleading insofar as they assumed the sale of all of the limited partnership units, the alleged fraud was evident from the face of the PPM. In light of the explicit disclosures and warnings in the offering materials and the publicity surrounding Integrated's financial demise, the *Southern Inns* Plaintiffs were placed on inquiry notice of the fraud they now allege over twelve months prior to the time their Complaint was filed. It follows that the *Southern Inns* Plaintiffs were placed on inquiry notice at the time they purchased investment units in the Partnership. Furthermore, the information available to them at the time of purchase was such that it placed them on notice of the probability and not merely the possibility of virtually every aspect of the §§ 10(b) and 12(2) securities

fraud claims they now allege in their Complaint.

With this background of the Partnership and the determination of when inquiry notice was triggered, the status of each Plaintiff to the action must be evaluated to determine whether his or her claim was timely when this action was filed. This exercise reveals that the § 10(b) claims of most of the *Southern Inns* Plaintiffs are time-barred under pre-*Ceres* law involving the application of New York's statutes of limitations, including the New York "borrowing statute," N.Y.Civ. Prac.L. & R. § 202 (McKinney 1990). *See generally, Ahmed,* 781 F.Supp. 1017; *Ceres,* 918 F.2d at 352–53.

■ The § 10(b) claims of most of these non-New York resident Plaintiffs are barred under pre-*Ceres* law because the § 10(b) limitation periods applied by the district courts embracing their respective residences had already expired at the time the action in *Southern Inns* was commenced; hence, pursuant to the New York "borrowing statute", they may not avail themselves of a longer time period established by New York law. The exception is the Plaintiffs who were residents of Florida and Illinois at the time they purchased an investment interest in Southern Inns. For the reasons set forth below, their claims survive Global Motion I.

*a. Section 10(b) Claims that are Time–Barred Under Statutes of Limitations Triggered by the Purchase of a Security*

The § 10(b) claims of two *Southern Inns* Plaintiffs are time-barred by the relevant statutes of limitations which are triggered by the purchase of a security, and which a district court sitting in respective circuits would be required to apply in this case.

1. Fifth Circuit: Alabama

■ A district court sitting in the Fifth Circuit and deciding the timeliness of a § 10(b) claim governed by pre-*Ceres* law would apply that state's blue sky law and hold that a plaintiff had two years from the contract date of the purchase of the security to bring an action for § 10(b) violations. *See White v. Sanders,* 650 F.2d 627, 629 (5th Cir.1981) (applying Alabama blue sky law,

Ala.Code § 8–6–19(e)). Ronald Stein, a resident of Alabama, purchased his investment unit in the Partnership on August 8, 1988 but did not join in bringing this action until October 19, 1990. Thus, Stein's § 10(b) claim is time-barred under the applicable Alabama law.

### 2. District of Columbia Circuit

■ Applying the applicable pre-*Ceres* law governing § 10(b) actions brought in the District of Columbia, a district court sitting there would apply D.C.'s blue sky law and hold that a plaintiff had two years from the contract date of the purchase of the security to bring this action. *See Forrestal Village, Inc. v. Graham,* 551 F.2d 411, 413 (D.C.Cir. 1977) (applying D.C. blue sky law, D.C.Code § 2–2613(e)). DeWest Hooker, a resident of Washington, D.C., purchased his investment unit in Southern Inns on July 29, 1988, more than two years before the Complaint in this action was filed. Thus, Hooker's § 10(b) claim is time-barred under the applicable Washington, D.C. law.

### b. Claims that are Time–Barred Under Statutes of Limitations Triggered by Inquiry Notice

The timeliness of the remaining § 10(b) claims brought by *Southern Inns* Plaintiffs are governed by the applicable state statute of limitations which are triggered by a plaintiff's being placed on inquiry notice of the fraud he subsequently alleges in his complaint against a defendant.

### 1. Second Circuit: Connecticut

■ Barring retroactive application of *Ceres,* a district court sitting in the Second Circuit on or before June 19, 1991 would have applied the forum state's most analogous statute of limitations. The statute of limitations for § 10(b) claims accruing in Connecticut prior to *Ceres* was the state's blue sky limitations period of two years. *See Welch I,* 923 F.2d at 995 (applying Connecticut blue sky law, Conn.Pub.Act 77–482 §§ 21, 30(c)); *Luca v. Hanson Indus.,* Fed.Sec. L.Rep. (CCH) ¶ 95,672, 1990 WL 163969 (D.Conn.1990); Conn.Gen.Stat. § 36–498(f) (1990). This period commences to run when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence would have led to actual knowledge.

Peter Leibold, a resident of Connecticut, purchased his investment unit in the Partnership on August 16, 1988 and was placed on inquiry notice as of that date of the § 10(b) allegations on which he is basing this present action. The original Complaint in this action was filed on October 19, 1990. Thus, Leibold's § 10(b) claim is time-barred under Connecticut law.

### 2. Third Circuit

■ On June 19, 1991, a district court sitting in the Third Circuit would have applied the statute of limitations established set forth in *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537 (3d Cir.) (en banc), *cert. denied sub nom. Vitiello v. I. Kahlowsky & Co.,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). *See Ceres,* 918 F.2d at 353 (applying *Data Access* rule to § 10(b) claim of New Jersey resident). In that case, the Third Circuit adopted a uniform statute of limitations for § 10(b) claims of "one year after the plaintiff discovers the facts constituting the violations, and in no event more than three years after such a violation." *Id.* at 1550. Although not relevant here, the Third Circuit has held that its holding is to be applied retroactively. *See Hill v. Equitable Trust Co.,* 851 F.2d 691, 698 (3d Cir.1988), *cert. denied sub nom. Data Controls N., Inc. v. Equitable Bank, Nat'l Assn.,* 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). This period is shorter than New York's two-year/six-year period, and is therefore applicable to the claims of New Jersey and Pennsylvania plaintiffs.

### (a) New Jersey

The following Plaintiffs are residents of New Jersey who purchased their units in the Partnership (and were placed on inquiry notice) more than one year prior to the filing of the Complaint and whose § 10(b) claims are, therefore, time-barred: Phillip and Laraine Katzev (January 26, 1989); Vo–Toys, Inc. (August 22, 1988); and John Lucania (July 13, 1988).

### (b) Pennsylvania

Barry Kraymark, a resident of Pennsylvania, purchased his investment unit in Southern Inns on October 13, 1988, and his § 10(b) claims are time-barred under Pennsylvania law.

### 3. Fourth Circuit

A district court sitting in the Fourth Circuit faced with the prospect of borrowing a state statute of limitations for federal purposes in a pre-*Ceres* case would apply the statute that "most clearly addresses the same or similar policy considerations as are addressed by the federal right being asserted." *Howard v. Haddad,* 962 F.2d 328, 330 & n. 3 (4th Cir.1992); *accord Gurley v. Documation, Inc.,* 674 F.2d 253, 258 (4th Cir. 1982); *O'Hara v. Kovens,* 625 F.2d 15, 18 (4th Cir.1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981).

### (a) Maryland

Under the law of Maryland, a plaintiff has one year from discovery of the alleged fraud to bring an action to recover on a § 10(b) claim. *See O'Hara,* 625 F.2d at 18 (applying Maryland blue sky law, Md.Corp. & Ass'ns Code Ann. § 11–703(f)). Plaintiffs J. Lee Bailey and Phyllis Bailey, residents of Maryland, purchased their investment interest in Southern Inns on July 28, 1988. Thus, their § 10(b) claims are time-barred under Maryland law.

### (b) North Carolina

Under North Carolina law, the statute of limitations on actions for securities fraud is two years from the date of discovery. *See Umstead v. Durham Hosiery Mills, Inc.,* 578 F.Supp. 342, 347 (M.D.N.C.1984) (applying N.C.Gen.Stat. § 78A–56(f)). The following Plaintiffs are residents of North Carolina and purchased their interests in the Southern Inns partnership more than two years prior to the commencement of this action, and their § 10(b) claims are, therefore, time-barred: Alotis Family Trust (July 21, 1988); Katherine Palmer (September 26, 1988); Jesse Fox (July 12, 1988); James Thompson (July 11, 1988); and Wesley Huggins (June 29, 1988).

### 4. Sixth Circuit: Tennessee

Federal district courts sitting in Tennessee are split as to which statute of limitations is to be borrowed for pre-*Ceres* § 10(b) actions. Several courts have applied the state's three-year common-law fraud limitations period, *see, e.g., Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309, 1320–21 (M.D.Tenn.1989); *Media General, Inc. v. Tanner,* 625 F.Supp. 237 (W.D.Tenn.1985), while the majority of district courts have borrowed the state's analogous one-year/two-year blue sky limitations period set forth in Tenn.Code Ann. § 48–2–122(h), *see, e.g., Ockerman v. May Zima & Co.,* 785 F.Supp. 695, 706 (M.D.Tenn.1992) ("*Ockerman II* "); *Ockerman v. May Zima & Co.,* 694 F.Supp. 414, 416 (M.D.Tenn.1988); *Haney v. Dean Witter Renyolds, Inc.,* No. CIV–1–85–531, 1986 WL 21340 (E.D.Tenn. Aug. 20, 1986).

This Court follows *Ockerman II* in holding that the appropriate statute of limitations to be applied in this case is Tennessee's blue sky limitations period "because it is the most analogous state statute of limitations." 785 F.Supp. at 706; *see Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); *Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981). Therefore, an action to recover on a § 10(b) claim is time-barred if it is brought one year after the violation was or should have been discovered.

Plaintiffs Robert Evans and Harriet Smith, residents of Tennessee, purchased their respective investment units in the Southern Inns partnership on July 25, 1988 and September 14, 1988. Thus, their § 10(b) claims are time-barred by the application of Tenn.Code Ann. § 48–2–122(h) to those claims.

### 5. Seventh Circuit: Illinois

Confronted with the matter at hand, a district court sitting in Illinois, the relevant Seventh Circuit state, would apply the statute of limitations applicable to actions for securities violations under that state's blue sky law. *See* Ill.Rev.Stat. ch. 121½, ¶ 137.–13(D) (1991); *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1460 (7th Cir.1992). Paragraph

137.13(D) prescribes a limitations period which runs for three years from the time when the plaintiff knows or should know that the securities laws have been violated and ends no more than five years after the sale of the securities.

■ Although the district court would borrow the Illinois state statute of limitations, the accrual of a federal cause is a question of federal law. *See McCool,* 972 F.2d at 1460; *Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir.1992); *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). Thus, an Illinois plaintiffs' cause of action accrues "on the date the sale of the instrument is completed," *McCool,* 972 F.2d at 1460 (quoting *Suslick v. Rothchild Sec. Corp.,* 741 F.2d 1000, 1005 (7th Cir.1984)), unless federal tolling principles apply, *see McCool,* 972 F.2d at 1461; *Suslick,* 741 F.2d at 1004.

Plaintiff Bhurji Singh, a resident of Illinois ("Illinois Plaintiff"), purchased on an investment interest in the Southern Inns partnership on September 1, 1988. He brought his § 10(b) claim against the *Southern Inns* Defendants in the Second Amended Complaint in that action, which was filed on January 7, 1991. Therefore, his § 10(b) is timely and Global Motion I as to it is denied.

### 6. Eighth Circuit

■ A district court sitting in the Eighth Circuit faced with the prospect of borrowing a state statute of limitations for federal purposes in a pre-*Ceres* case would apply the statute that "best effectuates the federal policy at issue." *Vanderboom v. Sexton,* 422 F.2d 1233, 1237 (8th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).

#### (a) Iowa

■ A district court sitting in Iowa deciding a pre-*Ceres* action for a § 10(b) claim would apply the two-year statute of limitations period set forth in Iowa's blue sky statute, Iowa Code § 502.26, rather than the five-year limitations period applicable to common-law fraud actions brought in that state. *See In re Alodex Corp. Sec. Litig.,* 533 F.2d 372, 374 (8th Cir.1976).

Plaintiff Ali Kholeif, a resident of Iowa, purchased an interest in Southern Inns on August 9, 1988. Under the applicable blue sky provision, Kholeif had two years from discovery of the alleged fraud to bring this action. Thus, Kholeif's § 10(b) claim is time-barred under the applicable Iowa law.

#### (b) Missouri

■ Pre-*Ceres* actions for § 10(b) violations heard by district courts sitting in Missouri are governed by the two-year statute of limitations set forth in Missouri's blue sky statute, Mo.Rev.Stat. § 409.411(e). *See Harris v. Union Electric Co.,* 787 F.2d 355, 360 (8th Cir.1986), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); *Morris v. Stifel, Nicolaus & Co.,* 600 F.2d 139, 146 (8th Cir.1979). The limitations period is tolled until the alleged fraud is discovered or, upon reasonable inquiry, when it should have been discovered. *See Harris,* 787 F.2d at 360.

Data Comm, Inc. Salary Reduction Plan and Joseph Aldon, both residents of Missouri, purchased their investment interests in Southern Inns on September 12, 1988 and July 30, 1988, respectively, more than two years before the Complaint was filed. Thus, their § 10(b) claims are time-barred under the application of Missouri's two-year statute of limitations running from the date they were placed on inquiry notice.

### 7. Eleventh Circuit: Florida

■ A district court sitting in Florida, the relevant Eleventh Circuit state, would apply Florida's two-year statute of limitations applicable to actions under Florida Statutes § 517.301(1)(a)(2) (1991). *See Knight v. E.F. Hutton & Co.,* 750 F.Supp. 1109, 1112 (M.D.Fla.1990); *Byrne v. Gulfstream First Bank & Trust Co.,* 528 F.Supp. 692, 694 (S.D.Fla.1981) (applying Florida's blue sky law, Fla.Stat. § 95.11(4)(e)), *aff'd without op.,* 720 F.2d 686 (11th Cir.1983). The running of this statute of limitations is tolled until the alleged fraud is discovered or reasonably should have been discovered in the exercise of reasonable diligence. *See Osterneck v. E.T. Barwick Indus., Inc.,* 825 F.2d 1521, 1532, 1535 (11th Cir.1987), *aff'd,* 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146

(1989); *Knight,* 750 F.Supp. at 1112. Whether due diligence would have led to discovery more than two years before suit was filed is a jury question. *Id.* at 1112.

The § 10(b) claims of the *Southern Inns* Plaintiffs who were Florida residents at the time they purchased their interests in the Partnership survive the Moving Defendants' Global Motion I, because the question of whether due diligence would have led to the discovery of the fraud they now allege more than two years before they filed this action is a question for the jury to decide. Therefore, Global Motion I is denied as to the § 10(b) claims of Plaintiffs Joan Agurcia, Leonard Ganderton, Ruth Ganderton, Richard House, Henrietta House, Rhona Miller, Mary Walker, Elizabeth Walker Trust, and James Weldon ("Florida Plaintiffs").

### c. *All § 12(2) Claims are Time–Barred*

The *Southern Inns* Plaintiffs were on inquiry notice when they purchased their units of the Partnership between June 30, 1988 and January 31, 1989. Therefore, their § 12(2) claims are time-barred pursuant to the one-year statute of limitations of the 1933 Act.

### E. *The One–Year Statute of Limitation Bars Various Plaintiffs' §§ 10(b) and 12(2) Claims*

#### 1. Intermobile

The Intermobile MR Investors Limited Partnership was set up to acquire and maintain magnetic resonance imaging ("MRI") equipment, which was then to be contracted out to hospitals and physicians' groups. The Partnership was syndicated on November 7, 1988, and the general partners accepted investor subscriptions between November 30, 1988 and July 15, 1989. On September 5, 1991, the *Intermobile* Plaintiffs filed their Complaint against the Defendants.

In the Complaint, the *Intermobile* Plaintiffs allege several material misrepresentations and omissions in the private placement offering materials upon which they relied in investing in this limited partnership. These misrepresentations and omissions constitute the basis upon which the *Intermobile* Plaintiffs ground their §§ 12(2) and 10(b) securities fraud claims against the Defendants.

At the outset of the *Intermobile* Plaintiffs' allegations regarding the nature of the Defendants' conduct, the Plaintiffs explicate their reliance on Integrated's financial condition in investing in the Intermobile partnership:

> [A]s a result of the statements contained in the Offering Materials regarding Integrated Resources' exceptionally high quality reputation and Integrated's marketing programs, plaintiffs reasonably believed that Integrated Resources, its subsidiaries and affiliates, were deserving of a great amount of trust and confidence, which plaintiffs vested in them.

*Intermobile* Compl. ¶ 20.

The misrepresentations which the Plaintiffs assert contributed to the fraud perpetrated upon them by the Defendants include the following: (a) the investment was a unique opportunity that provided a "very attractive semi-annual cash distributions, safety, short holding period, and very substantial capital appreciation"; (b) the offering materials stressed that the MRI equipment was "the best diagnostic examine available" with "no competing technology on the horizon," and without advising the partners that the equipment was "already obsolete"; (c) the "extreme downside scenario" of the investment was that the "limited partners could expect to receive 8% to 12% in semi-annual cash distributions"; (d) Integrated or an affiliate would contribute funds to offset any unsold units; (e) there were no foreseeable technological advances that would render the equipment obsolete; (f) sufficient revenue would be generated to continue as a going concern and sustain the partnership; and (g) Integrated was financially stable. *Intermobile* Compl. ¶ 21.

*Intermobile* Plaintiffs allege further that the Defendants failed to disclose the following material facts:

> (a) that in the event all of the units were not sold, Integrated Resources and its affiliates ... were without the financial wherewithal to contribute to any shortfall inequity capital and that the Partnership

should be unable to repay the equity loan and would have to borrow such balance;

(b) that in the event all the units were not sold, the description of the offering, use of the proceeds, allocation of the capital contributions and illustrations of the anticipated economic returns to the limited [partners] would not reflect the actual condition or reasonable expected returns from the offering or operation of the Partnership, but that the equity loans would remain outstanding, thereby increasing the debt/equity ratio and diverting funds otherwise available for capital investment and income distributions to service the undisclosed debt;

(c) that at the time of the offering, commencing in June 1988 and continuing through February 1990, Integrated Resources had significantly overvalued its assets and shareholder equity by, among other things, listing as assets over $200 million in receivables from prior syndications of limited partnerships that were troubled or in default and could not be expected to pay such receivables;

(d) that Integrated had been unable to successfully market all the units of its limited partnership offerings as had already occurred in several partnerships ...;

(e) that the investment was not a unique health care investment opportunity and ... the equipment which was already obsolete at the time of the offering ...;

(f) that a lag in providing upgrades to the equipment created a market perception problem [and] ... caused the partnership to be without enough clients for the use of its machines and to lose significant goodwill; and

(g) that omitted from the financial projections were operating and administrative cost increases of between 10% to 27%, all of which were known to the [Defendants] ... at the time the interests in the Partnership were sold....

*Intermobile* Compl. ¶ 22.

The §§ 12(2) and 10(b) claims in the Complaint are time-barred because the *Intermobile* Plaintiffs were on inquiry notice of the alleged frauds from the November 1988 PPM, from the publicity surrounding the financial difficulties of Integrated, and from letters of October 26, 1989 and April 9, 1990 sent by the Partnership to the limited partners.

To the extent that the Plaintiffs allege that they relied on Integrated's financial stability and commitment to offset any shortfalls in financing the Partnership, the Plaintiffs were placed on inquiry notice from the time they invested in the Partnership, and they were placed on further inquiry notice during the summer of 1989 when Integrated announced its debt moratorium and its subsequent unsuccessful struggle to refinance its debt burden and remain viable.

The PPM specifically stated, in bold, all-capitalized print, under the heading *"INTEGRATED RESOURCES, INC."*:

NOTWITHSTANDING THE FOREGOING [description of Integrated's financial condition], SINCE INTEGRATED HAS NO RESPONSIBILITIES OR OBLIGATIONS TO THE PARTNERSHIP, THE FINANCIAL CAPABILITY OF INTEGRATED SHOULD NOT BE VIEWED AS DIRECTLY OR INDIRECTLY BENEFITTING THE PARTNERSHIP.

Intermobile PPM at 125. Therefore, to the extent that any representations were made to the *Intermobile* Plaintiffs giving rise to the belief that Integrated's financial assets stood behind the Partnership, this explicit provision placed them on inquiry notice that something was amiss.

The *Intermobile* Plaintiffs allege that the Defendants concealed their fraud through incomplete, misleading, and materially untrue statements. The Plaintiffs point to various letters sent by the Partnership to the limited partners, including a letter dated October 26, 1989, in which the alleged concealment took place. The Plaintiffs assert that this letter misleadingly brought tidings of "good news" regarding the status of the Partnership. *Intermobile* Compl. ¶ 35.

The October 26, 1989 letter, however, expressly placed the Plaintiffs on inquiry notice regarding many of the issues that are referred to in their Complaint. For example, the letter informed the limited partners that

the financial condition of the Partnership was worse than it was a year earlier, while revenues were lagging behind the forecast; that lower utilization and rapid expansion of the fleet contributed to lower than projected profits; that the semi-annual distribution was to be delayed; and that interest, depreciation, and administrative overhead resulted in lower than anticipated net income. Rocano Aff. Ex. B at 8–9.

The April 9, 1990 letter went even further in explicitly advising the limited partners of numerous business problems the Partnership was experiencing, many of which are referred to in the Complaint. The limited partners were advised that "earnings for 1989 were disappointing" and that this "require[d] the Partnership to omit the cash flow distribution for 1989." *Id.* at B, 1. The letter further notified the limited partners that the operating fleet of mobile MRI equipment had generated "lower average utility rates," that the expansion of the fleet to 15 units had caused "higher operating depreciation and interest expenses" which "resulted in an operating loss," and that "two machines were out of services for significant periods of the third quarter." *Id.* The Plaintiffs do not dispute that they received the April 9, 1990 letter.

In light of the PPM, the publicity surrounding Integrated's financial demise, and the letters of October 26, 1989 and April 9, 1990, the *Intermobile* Plaintiffs were placed on inquiry notice of the fraud they now allege at least seventeen months before their complaint was filed. Furthermore, the information available to them at that time was such as to place them on notice of the probability and not merely the possibility of virtually every aspect of the §§ 10(b) and 12(2) securities fraud claims they now allege in their Complaint.

It follows that the one-year statute of limitations began to run no later than April 9, 1990 and expired well before the *Intermobile* Complaint was filed on September 5, 1991. Therefore, the *Intermobile* Plaintiffs' §§ 10(b) and 12(2) claims are time-barred by the applicable one-year statute of limitations periods and are dismissed as untimely commenced.

## 2. Rittenhouse

The Rittenhouse Square Associates Limited Partnership was organized to own, maintain, and operate a residential apartment building consisting of 104 apartment units and approximately 9,400 square feet of commercial space, in Philadelphia, Pennsylvania. The Partnership was syndicated on September 6, 1988, and on October 15, 1991, the *Rittenhouse* Plaintiffs filed their Complaint against the Defendants.

In the Complaint, the Plaintiffs allege several material misrepresentations and omissions in the PPM upon which they relied in investing in this Partnership. These alleged misrepresentations and omissions constitute the basis upon which the *Rittenhouse* Plaintiffs ground their §§ 10(b) and 12(2) securities fraud claims against the Defendants.

The *Rittenhouse* Plaintiffs' preface their allegations against the Defendants by discussing the financial strength of Integrated and their reliance on representations regarding Integrated in deciding to invest in this Partnership:

> Statements contained in the Offering Materials and Integrated's marketing programs regarding Integrated's exceptionally high quality reputation, in addition to similar oral representations made, caused plaintiffs to believe that Integrated, as well as its subsidiaries and affiliates, were deserving of a great amount of trust and confidence, which plaintiffs reasonably vested in them.

*Rittenhouse* Compl. ¶ 9.

Turning to the series of alleged material misrepresentations and omissions in the offering materials, the *Rittenhouse* Plaintiffs contend that the Partnership's property, a residential apartment building in Philadelphia, Pennsylvania, which was to be converted into condominiums over a five year period from the date of the offering, was falsely represented as being in a "dynamic" market, in "a premier neighborhood," and backed by Integrated—"one of the nation's leading diversified financial service companies." *Rittenhouse* Compl. ¶¶ 14, 15. The result was that the Partnership was "virtually ensured of success." *Id.* ¶ 14.

The related material omissions alleged by the Plaintiffs include the failure to disclose that "there was no 'dynamic growth' for the Partnership to take advantage of in Philadelphia" because of a glutted real estate market; that the appraisal provided by Cushman & Wakefield was misleading because "it did not address the survivability of the project during the first five years"; that "there were insufficient revenues to be generated"; and that "there was no equity reasonably to have been gained by the limited partners." *Id.* ¶¶ 17, 18.

It is also alleged that Integrated's financial condition was misrepresented and that the Defendants did not intend to increase the equity in the property, but instead pledged the investors' notes to get cash to meet Integrated's own financial needs. These notes were pledged to Marine Midland Bank, which ultimately sued the Partnership. As a result of the suit, the Partnership was unable to use approximately $186,000 of Partnership funds and was prevented from receiving an additional $232,000.

Finally, the Plaintiffs claim that they did not know, and could not have known, of the alleged frauds until they received a letter from the general partner, dated November 20, 1990, which advised the limited partners that the Partnership did not have sufficient income to meet its obligations.

 However, a letter from the general partner dated March 8, 1990 placed the *Rittenhouse* Plaintiffs on inquiry notice regarding these various issues some eight months prior to the November letter. The March 8, 1990 letter informed the limited partners of the financial difficulties facing the Partnership. The rents were below projections and the property was only 84% leased. Furthermore,

[p]reliminary operating reports indicate that 1989 income was below the projections in the Confidential Offering Memorandum. Among the causes of this variance are greater than anticipated vacancy losses due to construction activities, the loss of a tenant who had master leased several

units, and higher than projected operating expenses.

Rocano Aff. Ex. C at 1.

With respect to the Plaintiffs' claims concerning the pledging of their notes, the allegations of fraud in ¶ 17(b) of the October 15, 1991 *Rittenhouse* Complaint are a virtually verbatim recitation of the facts set forth in the March 8, 1990 letter. The letter informed the limited partners, in detail, of the suit brought by Marine Midland Bank against the Partnership and of the adverse affect it had on the Partnership's funds and its operations. Additionally, the March 8, 1990 letter advised the limited partners that Integrated had filed for bankruptcy protection on February 13, 1990, and that "there can be no assurance that Integrated will continue to so advance funds to the Partnership if such funds are needed." *Id.* at 2.

The *Rittenhouse* Plaintiffs assert that these gloomy facts were overshadowed by the statement in the letter that "[w]hile the lower-than-projected income for 1989 reduced the amount available for capital expenditures during the year, we do not anticipate that this will impair the property's performance in the long run." *Id.* at 1. This statement, combined with the fact that the Partnership was then operating at a profit, in the Plaintiffs' view, prevented them from being placed on inquiry notice any time prior to the November 20, 1990 letter.

The Plaintiffs' claim regarding their ability to rely on this positive assurance is mistaken. Judge Conboy's statement in *Farr*, 755 F.Supp. at 1228, is equally appropriate here: This lone statement "of cautious optimism ... [did] not rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry presented by the cold numbers contained in the" March 8, 1990 letter. *See Zola I*, 685 F.Supp. at 366.

Finally, the Rittenhouse PPM itself contained numerous statements which gave notice of the facts which the Plaintiffs now contend to have been fraudulent misrepresented or omitted. The Plaintiffs' claim regarding the alleged inadequacy of the Cushman & Wakefield appraisal fails to note the explicit limitations set forth in the appraisal

itself. The purpose of the study was "to estimate the gross sell-out price of the project, assuming conversion to condominium ownership, as of January 1, 1993." Rittenhouse PPM Ex. D at 155. Thus, the *Rittenhouse* Plaintiffs' claim that they were misled because the appraisal failed to address the viability of the project during the first five years is necessarily unfounded. These Plaintiffs had the requisite information in the appraisal, which was part of the PPM, to make an informed evaluation of the scope of the appraisal and the viability of the project.

The Plaintiffs also allege in the Complaint that they were promised to receive financial returns sooner than is typically expected in such a real estate investment: Investors would collect pre-tax conversion proceeds of $236,633 per $98,000 invested, and the short holding period of five years would enable investors to receive their capital back more quickly.

The offering material, however, explicitly stated that there could be no assurances that the partnership would be able to convert the project to condominium status according to the time schedule or prices set forth in the accompanying economic forecasts:

> [A]ctual results of operations or operating properties, such as the Project, are inherently subject to unpredictable events and, for that reason, cannot be predicted with any degree of certainty. Actual results of operations and an Investor's economic and tax benefits arising therefrom, are likely to vary from year to year from the results forecasted.

Rittenhouse PPM at 45.

In light of the offering materials, the publicity surrounding Integrated's financial demise, and the letter of March 8, 1990, the *Rittenhouse* Plaintiffs were placed on inquiry notice of the alleged §§ 10(b) and 12(2) violations they now raise at least nineteen months before they filed their Complaint on October 15, 1991. Furthermore, the information available to them at that time was such as to place them on notice of the probability and not merely the possibility of virtually every aspect of the §§ 10(b) and 12(2) securities fraud claims they now allege in their Complaint.

Therefore, the one-year statute of limitations began to run no later than March 8, 1990 and expired well before the *Rittenhouse* Complaint was filed. As a result, the *Rittenhouse* Plaintiffs' §§ 10(b) and 12(2) claims are dismissed as untimely commenced.

### 3. Fillmore/Greene's [21]

The Fillmore Pacific Associates Limited Partnership was organized to acquire, own, and manage a 93% limited partnership interest in Fillmore Center Associates, a partnership set up to own, develop, construct, maintain, and operate a mixed use multi-family rental development, consisting of 1,113 apartments and 73,000 square feet of retail space, in San Francisco, California. The Partnership was syndicated on January 11, 1988, the Plaintiffs purchased their partnership units in 1988 and 1989, and on February 8, 1991, the Plaintiffs filed their Complaint against the Defendants.

At the outset of the *Fillmore/Greene's* Plaintiffs' allegations regarding the Defendants' conduct, the Plaintiffs explicate their reliance on Integrated's financial condition in investing in the partnership, using the same description of Integrated as was used in the *Intermobile* Complaint quoted above. In the Complaint, the Plaintiffs allege several material misrepresentations and omissions in the offering materials upon which they relied in investing in this limited partnership. These misrepresentations and omissions constitute the basis upon which the *Fillmore/Greene's* Plaintiffs ground their §§ 12(2) and 10(b) securities fraud claims against the Defendants.

The alleged misrepresentations and omissions relate to Integrated's financial stability, the costs and schedule for construction of the partnership property, and the various "safety

---

**21.** The analysis of *Fillmore/Greene's* also applies to *Fillmore/Enviro* because the securities fraud allegations are identical and the information available to the plaintiffs in both actions was the same. Thus, even if *Fillmore/Enviro*'s §§ 10(b) and 12(2) claims survived the three-year of statute of limitations, which they do not, they would still fail to be timely under the one-year statute of limitations.

features" designed to protect the Partnership and limited partners against construction cost overruns and delays:

(a) Integrated's net worth and financial wherewithal were grossly misrepresented and overstated ...;

(b) Developers' much-heralded "guaranties" [against cost overruns and operating deficits and capping the maximum price of the construction contract] were virtually valueless and provided no protection to investors ...;

(c) the $8 million of "reserves in the development budget was wholly inadequate to protect against the collapse of the Project ...";

(d) contrary to the detailed explanations of the safety of an investment in the Partnership, the Partnership was forced to return to the investors for approval of a proposed additional borrowing of $20,000,000 in November 1990 ...;

(e) the "(g)uaranteed maximum price construction contract" and the bonding of all significant construction performance were misrepresented as providing protection against overruns and delays. In fact, after the offering, ... the general contractor demanded a new and higher guaranteed maximum price; ...

(f) the excessive fees that the Integrated and Tishman defendants charged plaintiffs and the excessive price that the Integrated and Tishman defendants caused the Partnership to pay for the operating interest in the Property, made it very unlikely that investors ... could ever achieve a profit from their investments ... and left the Partnership with insufficient construction capital and in a precarious position such that bankruptcy or inability to continue construction as scheduled would likely result; [and]

(g) the offering materials omitted to state that by late January 1988, prior to the sale of any limited partnership interests to plaintiffs, the project on which construction had commenced in early August, 1987 had encountered approximately $10 million of cost overruns which [the general contractor] advised it would not take responsibility for and which neither the Inte-

grated nor Tishman defendants had the financial wherewithal to pay for.

*Fillmore/Greene's* 1st Am. Compl. ¶ 25.

■ The Plaintiffs were placed on inquiry notice of these various issues, which now constitute the basis of their §§ 10(b) and 12(2) claims, by the publicity surrounding Integrated's financial difficulties and subsequent demise beginning in June 1989, and by a letter and solicitation statement from the Partnership dated August 24, 1989 (collectively, "August 1989 Solicitation"). The purpose of the August 1989 Solicitation was to solicit the consent of the limited partners to a restructuring of the debt of the Operating Partnership and the Partnership, and the Plaintiffs acknowledge receipt of the August 1989 Solicitation.

The August 1989 Solicitation provided a detailed description of the Partnership's financial difficulties, including the following: the construction cost overruns that had been encountered; the extension of the anticipated construction completion schedule; the intention of the lenders to foreclose; the failure, inability and/or unwillingness of the general contractor and developer to protect the Partnership; the necessity to substantially increase the Partnership's debt; and Integrated's own financial difficulties. Thus, the August 1989 Solicitation provided the *Fillmore/Greene's* Plaintiffs with virtually all of the information upon which they subsequently relied in alleging their securities fraud claims against the Defendants.

With regard to the construction cost overruns, the first page of the August 24, 1989 letter expressly referred to "needed additional financing to pay for cost overruns experienced in the construction of the Fillmore Center." Rocano Aff. Ex. D at 1. The limited partners were specifically advised that the Project's new construction manager determined that the Operating Partnership would require "at least an additional $9,500,000 in excess of the amount contemplated in the [March 31, 1989 solicitation] in order to complete construction of the Project." *Id.* at 5.

Moreover, the August 1989 Solicitation advised the limited partners that, in August

1988, the original general contractor had projected "substantial cost overruns," and that, in October 1988, the general contractor had "demanded that [the] Operating Partnership agree to a new Guaranteed Maximum Price of $123,000,000." *Id.* at 8. This amount was nearly $40,000,000 more than the original Guaranteed Maximum Price of $83,750,000 disclosed in the Fillmore PPM.

The *Fillmore/Greene's* Plaintiffs also were placed on inquiry notice of their claim that the construction schedule was "grossly underestimated" in the offering materials. *Fillmore/Greene's* 1st Am. Compl. ¶ 21. The August 1989 Solicitation advised the Plaintiffs that the anticipated completion of the Project, which had been "scheduled for late 1989," was "currently anticipated ... [to] occur in October 1990," almost a year behind schedule. Rocano Aff. Ex. D at 8.

The August 1989 Solicitation provided a detailed review of the original financing and set forth a chronological discussion of the problems encountered with the lenders. The limited partners were explicitly and repeatedly advised that foreclosure was imminent.

Moreover, with regard to the partnership's alleged "safety features" involving the general contractor, developer, and Integrated, the August 1989 Solicitation alerted the Plaintiffs to substantial problems into which a reasonable investor would have made further inquiry. The limited partners were informed that the general contractor had been terminated and was being sued by the Operating Partnership and that he, in turn, was countersuing for $17,000,000. They also were notified that the developer's management company had been replaced, that the developer had been removed as Managing General Partner of the Operating Partnership, and that, in connection with the restructuring, the developer would be released from all obligations.

Finally, the August 1989 Solicitation advised the Fillmore limited partners of the financial difficulties Integrated was experiencing, to wit, a "liquidity crisis" that prevented it from providing the Partnership with any additional capital in connection with

the March 31, 1989 contemplated restructuring as a result of the declared debt moratorium. The limited partners were also told that, while over $50,000,000 had been borrowed by the Operating Partnership on the basis of guarantees by Integrated, the declared debt moratorium by Integrated had eliminated any further funding by Integrated.

The *Fillmore/Greene's* Plaintiffs assert that they even if they were placed on inquiry notice with regard to various aspects of the alleged fraud by the August 1989 Solicitation, they had no notice regarding the gravamen of their Complaint, namely, the Defendants' fraudulent concealment of any information regarding substantial cost overruns occurring before the syndication, from any Partnership correspondence.

The Plaintiffs' reasoning is defective on two counts: First, the central claim in the Plaintiffs' Complaint is that the Defendants misrepresented that "the Partnership was reasonably expected to be profitable for investors." *Fillmore/Greene's* 1st Am. Compl. ¶ 22. The alleged misrepresentations and omissions concerning the "safety features" and the pre-syndication cost overruns are alleged in the Complaint to have been the means by which the prospective profitability of the investment was misrepresented. Therefore, the Plaintiffs cannot not argue that the August 1989 Solicitation statement did not place them on notice to inquire into the reasons for the Partnership's dire financial situation. Second, the August 1989 Solicitation expressly identified the cost overrun of almost $40,000,000 for the entire project. Rather than concealing the alleged cost overruns incurred prior to the syndication, this statement placed the Plaintiffs on notice to investigate why, less than half-way into the construction of the project [22] and within months of the syndication, the general contractor was projecting that the total cost to complete construction would be $40,000,000 more than originally estimated before construction began.

In light of the publicity surrounding Integrated's financial demise and the August

---

22. The Project began in mid–1987 and was origi- nally scheduled to be completed by late 1989.

1989 Solicitation, the *Fillmore/Greene's* Plaintiffs were placed on inquiry notice of the fraud they now allege at least seventeen months before they filed their Complaint on February 8, 1991. Furthermore, the information available to them at that time was such as to place them on notice of the probability and not merely the possibility of virtually every aspect of the §§ 10(b) and 12(2) securities fraud claims they now allege in their Complaint.

Therefore, the one-year statute of limitations began to run no later than August 24, 1989 and expired well before the *Fillmore/Greene's* Complaint was filed. As a result, the *Fillmore/Greene's* §§ 10(b) and 12(2) claims are dismissed as untimely commenced.

### 4. West Palm/Coleman and West Palm/Baird

The West Palm Associates Limited Partnership was organized to develop, construct, own, maintain, and operate a residential housing development consisting of 582 apartment units and other amenities. The Plaintiffs have commenced two separate *West Palm* actions, asserting identical allegations: *West Palm/Coleman* was filed on January 19, 1991 and *West Palm/Baird* was filed on February 13, 1991. The Partnership was syndicated on June 21, 1988, and the general partners accepted investor subscriptions between July 15, 1988 and March 15, 1988.

▇▇▇ The offering materials of the Partnership are alleged to have been false and misleading as a result of various misrepresentations and omissions of material facts. The misrepresentations included the following: Integrated would raise or contribute $18,711,000 in equity to the Partnership; the general partner would contribute funds to offset any unsold units of the Partnership; the Partnership would have 30% equity stake in the project; Integrated was financially stable and would guarantee certain obligations of the Partnership; the fair market value of the Partnership was between $66,000,000 and $68,000,000; and the project would generate sufficient revenues to continue as a going concern and sustain the Partnership. *See West Palm* 1st Am. Compl. ¶ 28.

The Plaintiffs alleged that the offering materials also were false and misleading because of various omissions by the Defendants, namely,

(a) that in the event all the units were not sold, they were without wherewithal to contribute the shortfall in equity and would cause the Partnership to borrow the balance;

(b) that in the event all the units were not sold, they would cause the Partnership to be liable for principal and interest on loans from First Fidelity [Bank] and [Resources Funding Corporation, a wholly-owned subsidiary of Integrated];

(c) that in the event all the units were not sold, the description of the offering, use of the proceeds, allocation of the capital contributions and illustrations of the anticipated economic returns to the limited partners would not reflect the actual condition or reasonable expected returns from the offering or operation of the Partnership;

(d) that at the time of the offering, commencing in June, 1988 and continuing through February, 1990, Integrated Resources had significantly overvalued its assets by ... claiming over $250 million in receivables from troubled and defaulting prior limited partnerships it had syndicated and that could not be expected to pay such receivables;

(e) that the alleged fair market value of the property was inflated;

(f) that Integrated had no basis in fact for its financial projections; and

(g) that Integrated needed to syndicate the property so as to generate funds for itself as well as to enable it to continue to obtain credit in the face of then existing serious financial difficulties.

*Id.* ¶ 29.

The gravamen of the Complaint, as it emerges from these alleged misrepresentations and omissions, is that the offering materials were false and misleading insofar as they provided an investment summary and *pro forma* balance sheet which projected future economic benefits on the assumption

that the entire Partnership offering had been sold and failed to disclose the possibility that all of the units would not sell.

The West Palm PPM, however, disclosed in at least three separate places the possibility that the proceeds from the offering might be insufficient thereby indicating that all of the units might not sell, and nowhere in the PPM was any representation made regarding the amount of equity that would be raised from the offering. For example, the PPM contained the same explanatory clause as was set forth in the Southern Inns PPM (at 140) quoted above. *See* West Palm PPM at 75.

The *West Palm* Plaintiffs rely on *Martin,* 1991 WL 131176, *1, 1991 U.S. Dist. LEXIS 9234, at *3, alleging that even with these warnings in the offering materials, they were not placed on inquiry notice concerning the alleged fraud because the Defendants failed to disclose that recent similar investments they had syndicated were not fully subscribed. For the reasons stated above in the discussion of *Southern Inns,* this contention is rejected, and the *West Palm* Plaintiffs are held to have been on inquiry notice at the time they purchased their shares in the Partnership.

Therefore, the Plaintiffs were placed on inquiry notice of the fraud they now allege by the June 21, 1988 by the West Palm PPM itself, well over twelve months before the Plaintiffs filed their respective Complaints. Furthermore, the information available to them at that time was such as to place them on notice of the probability and not merely the possibility of the §§ 10(b) and 12(2) securities fraud claims they now allege in their Complaint. Thus, these claims are time-barred under the relevant statutes of limitations.

### 5. 600 Grant Street/Schoonmaker

■ The Partnership at issue in *600 Grant Street/Schoonmaker* was formed to acquire, own, operate, manage, finance, and eventually sell or dispose of the United States Steel Building, a sixty-four story office building located on approximately two-and-a-half acres of land in Pittsburgh, Pennsylvania. The Plaintiffs purchased a seven-unit limited partnership interest in the 600 Grant Street Partnership in May 1989, several years after the original Partnership offering was made in 1985 and 1986.

The Plaintiffs allege §§ 10(b) and 12(2) securities fraud violations on the ground that the Defendants failed to disclose various material facts prior to the sale of the partnership units. These omissions include the following: Integrated was "only days ... [from] delcar[ing] a moratorium on the payment of all of its debts leading to its eventual bankruptcy," *600 Grant Street/Schoonmaker* Compl. ¶ 1; "there was no reasonable likelihood that the Property or the subject securities could generate the represented tax savings because the financial condition of the Partnership and Sivram was, at the time, severely impaired," *id.* at ¶ 16; Integrated was in an "impaired financial condition" which would have an adverse impact upon the Partnership and Sivram, *id.* at ¶ 21; and the Partnership sustained operating losses "due to the presence of asbestos and the cost of its removal," *id.* at ¶ 23.

Despite these allegations, the Plaintiffs acknowledge in their Complaint that they were aware of Integrated's bankruptcy by May 1990. *See id.* at ¶ 25. Thus, the Plaintiffs were placed on inquiry notice as of that time with respect to the facts upon which they now base their allegations of fraud that relate to Integrated's financial condition.

In a letter dated May 17, 1990, all *600 Grant Street* limited partners were advised, *inter alia,* that Integrated had filed a bankruptcy petition, that certain services previously performed by Integrated might be affected by the bankruptcy, and that the likelihood Integrated would continue to fund shortfalls in debt payments or pay other Partnership expenses were thereby reduced.

The following month, the Plaintiffs were provided with additional information regarding the impaired condition of the Partnership. In a letter dated June 20, 1990, the limited partners were notified of several significant developments: The cash flow generated by the partnership's property was insufficient to meet debt service obligations under the first mortgage; previous debt service shortfalls in excess of $10,000,000 had been

funded by Integrated subsidiaries which themselves had no assets other than promissory notes from Integrated, making it highly unlikely that any further obligations of the Partnership would be met by those guarantors; the first mortgagee had agreed to defer $8,000,000 in debt service upon which an Integrated subsidiary had defaulted; and while foreclosure by the first mortgagee was averted for the time being, further restructuring of the partnership's debt would be required.

■ Finally, with respect to the Plaintiffs' claim concerning the asbestos, the Plaintiffs had knowledge of sufficient facts both prior to and immediately following their investment in the 600 Grant Street Partnership regarding the asbestos situation to place them on inquiry notice. At the time of their investment, the Plaintiffs were fully aware of the fact that the costly asbestos abatement program had been commenced in the building because they received the Investor Correspondence previously transmitted to all limited partners, including a letter of March 7, 1988, in which it was disclosed that $5,000,000 had been set aside by management for asbestos abatement in 1988 alone.

Following their investment, the Plaintiffs received additional Investor Correspondence concerning the costs of the asbestos removal program. In a letter dated May 31, 1989, the Plaintiffs were advised that the partnership was continuing with its "costly asbestos abatement program," that the program called for abatement at the rate of approximately four floors per year, that the partnership had already spent approximately $7,000,000 on the program, and that $3,000,000 more was budgeted for abatement during 1989. Rocano Aff. Ex. E at 12–13. The aforementioned June 20, 1990 letter also noted the "continuation of the asbestos abatement program." *Id.* at 17.

The Plaintiffs attempt to avoid the effect of the statute of limitations by claiming the correspondence sent to them by the Partnership's legal counsel in March 1990 led them to believe that the bankruptcy would have no effect on the operation of the Partnership or on their investment: "[T]he bankruptcy's impact on Integrated's ability to assist Schoon-

maker was not apparent from the notice of the bankruptcy." Pls.' Mem. in Opp. at 131. The Plaintiffs claim they had no reason to believe they had been defrauded until they received a letter dated March 18, 1991 from the Partnership allegedly indicating that Integrated and certain of its subsidiaries had been replaced as manager of the Partnership property and that an Integrated subsidiary had defaulted on its obligation to guaranty Partnership debt service.

In light of the publicity surrounding Integrated's financial demise and the letters of March 7, 1988, May 31, 1989, May 17, 1990, and June 20, 1990 from the Partnership to the limited partners, the *600 Grant Street/Schoonmaker* Plaintiffs were placed on inquiry notice regarding virtually every aspect of the fraud they are now alleging in a Complaint filed well after the one-year statute of limitations. Thus, the Plaintiffs' §§ 10(b) and 12(2) claims are time-barred and are dismissed.

Therefore, the Moving Defendants' Global Motion I is granted as to the Plaintiffs' §§ 10(b) and 12(2) claims in *Research Triangle, 600 Grant Street/Reagan, 600 Grant Street/Schoonmaker, Clovine/Standefer, Clovine/Ellingson, West Palm/Baird, West Palm/Coleman, Rittenhouse, Fillmore/Greene's, Fillmore/Enviro,* and *Intermobile,* and is granted as to the Plaintiffs' § 12(2) claims and as to all of the Plaintiffs' § 10(b) claims in those actions, except those of the Florida Plaintiffs and the Illinois Plaintiff, in *Southern Inns.* Global Motion I is also granted as to the Plaintiffs added by the First and Second Amended Complaints in *Hunter Publishing.* Global Motion I is denied as to the § 10(b) claims of the Florida Plaintiffs and Illinois Plaintiff in *Southern Inns,* and it is denied as to the Plaintiffs' §§ 10(b) and 12(2) claims in *Lenox Towers,* and as to the Plaintiffs named in the original Complaint in *Hunter Publishing.*

*Global Motion II*

In light of the disposition of the various cases on the Global Motion I, three actions remain for consideration on the Moving Defendants' Global Motion II: the §§ 10(b) and 12(2) claims in *Hunter Publishing* and *Lenox*

*Towers*, and the § 10(b) claims of the Florida Plaintiffs and the Illinois Plaintiff in *Southern Inns*. On this motion, the Moving Defendants seek the dismissal of these claims pursuant to Rules 12(b), 12(c), and 9(b), Fed. R.Civ.P.

Again for simplicity's sake, general legal principles governing the pleading requirements for fraud will be laid out here and applied in more detail below. Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to protect a defendant's professional reputation, and to reduce the number of strike suits. *See Di Vittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *Stern v. Leucadia National Corp.*, 844 F.2d 997, 1003 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988).

The requirements of Rule 9(b) should be applied stringently, especially "where allegations of securities fraud are involved." *Ruff v. Genesis Holding Corp.*, 728 F.Supp. 225, 227 (S.D.N.Y.1990). The strict application of Rule 9(b) in securities fraud litigation "reduces the possibility that conclusory complaints will enable a plaintiff to engage in lengthy and costly discovery, 'with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence....'" *Lou v. Belzberg*, 728 F.Supp. 1010, 1022 (S.D.N.Y. 1990) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978)).

Rule 9(b) pleading requirements (which dictate that plaintiffs must specify the time, place, and manner of making the fraudulent statement) are "somewhat relaxed where ... plaintiff[s] base [their] complaint on an Offering Memorandum." *Stevens v. Equidyne Extractive Indus. 1980*, 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). "Reference to the Offering Memorandum satisfies 9(b)'s requirements as to identification of the time, place and content of the alleged misrepresenta-

tions." *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). However, "allegations grounded in the offering memorandum [must] be based on specific facts allegedly misrepresented in that memorandum." *Tobias v. First City Nat'l Bank and Trust Co.*, 709 F.Supp. 1266, 1277 (S.D.N.Y.1989) (construing *Luce*, 802 F.2d at 55). This applies to private offering materials the general rule for fraud: That any Plaintiffs must specify "'precisely what statements were made in what documents or oral misrepresentations.'" *Tobias*, 709 F.Supp. at 1277 (quoting *Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)).

Therefore, the offering materials used to sell the partnership interests to the Plaintiffs will be considered by this Court here in Global Motion II as in Global Motion I and for the same reasons. They are still "integral to [P]laintiffs' claim[s] and thus may be considered by the Court on a motion to dismiss." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991); *Ruff*, 728 F.Supp. at 226.

## I. Hunter Publishing

The Integrated Defendants (here IR Publishing, IR Credit, and Integrated Resources Equity Corporation) have moved to dismiss the claims of the Plaintiffs added by the two Amended Complaints in *Hunter Publishing* on the grounds that both of the Amended Complaints were filed after June 19, 1991, the date on which the new Plaintiffs' claims became barred by *Lampf*. This motion is granted.[23]

The Integrated Defendants have also moved to dismiss all of the remaining Plaintiffs' claims for failure to state a claim pursuant to Rule 12(b)(6) and for failure to plead fraud with the particularity required by Rule 9(b). Both the Defendant Deloitte & Touche and the Defendants Elliot Stein, Jr. and I. Martin Pompadur have joined in this motion, but they have also filed separate and independent motions on precisely the same

---

**23.** See the discussion *supra* in Global Motion I § III.A.

grounds and for the same reasons. All three motions are granted.

### A. *Facts*

■ On a motion to dismiss, the facts alleged by the plaintiffs must be accepted as true, and all factual inferences must be drawn in favor of the plaintiffs. *See Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Accordingly, the facts below are taken from the Plaintiffs' Second Amended Complaint and do not represent any findings of fact by this Court.

Hunter Publishing Company, Inc. ("Hunter") is a Delaware corporation allegedly controlled by I. Martin Pompadur ("Pompadur") and Elliot Stein, Jr. ("Stein"). In 1986, Pompadur and Stein bought IR Publishing Limited Partnership ("IR Publishing"), a publisher of industrial trade magazines, for approximately $26.5 million in an apparently fully leveraged buyout (the "Initial Acquisition") that left the new company (Hunter) $27 million dollars in debt to Manufacturers Hanover (the "Bank").[24] Pompadur and Stein each owned 50% of the stock of the new company and each personally guaranteed the loan to the Bank.

By 1987, Hunter's cash flow was insufficient to pay off the debt as scheduled. Hunter then sought and was refused additional credit (the Plaintiffs do not say from or by whom). Pompadur and Stein turned next to Integrated Resources Equity Corporation ("IREC") a wholly-owned subsidiary of Integrated. IREC syndicated Hunter as a limited partnership in July, 1988 (the "Offering"). Integrated formed IR Publishing Credit Corp. ("IR Credit") to finance the capital contributions of limited partners who wished to pay for their interests through a combination of cash and promissory notes instead of straight cash. The Plaintiffs do not say whether Hunter or Integrated first retained the accounting firm Touche, Ross & Co., whose successor in these actions is Deloitte & Touche ("Touche") but allege that Touche served as the accountants for Hunter prior to, during, and after the formation of the Limited Partnership.

If the Offering were successful and the Defendants succeeded in syndicating Hunter as a limited partnership, the Bank promised to renegotiate the loan on terms more favorable to Hunter. The Offering was successful by November 1988 (the date is supplied by the Defendants; the Plaintiffs do not allege when they bought) and the loan was renegotiated. Among other new terms, Pompadur and Stein were no longer required to guarantee personally Hunter's finances.

The Plaintiffs allege that the Offering was successful only because of the Defendants' misstatements and omissions. These were communicated through a Confidential Private Placement Memorandum dated July 20, 1988 (the "Hunter PPM"), a Broker–Dealer Summary, a color brochure, a product audio tape, and an undated information memorandum (the "Offering Materials"). The Offering Materials included certified financial statements for the year ending 1987 and the last four months of 1986, and an unaudited set of financial statements for the first four months of 1988, all issued without qualification by Touche. The Plaintiffs apparently had purchased their interests by November 1988, but allege they were not put on notice of Hunter's dire financial condition until they were informed in August 1990, that Hunter's income was insufficient to service its debt. The Defendants do not contest this date as the date of inquiry notice. These facts bring their claims within the three-year/one-year statute of limitations laid down by *Ceres* for actions (such as the Complaint in *Hunter Publishing* ) filed in New York after 1990.

The Plaintiffs allege that the Defendants promised that the managing general partner (Hunter Publishing)[25] would contribute $10 million in equity to the Partnership, that

---

**24.** Six lines further on, however, the Plaintiffs allege that at the time of the Offering in 1988 the Bank was owed $22.5 million. The Confidential Private Placement Memorandum lists the principal amount of the Bank Loan as approximately $22.5 million. *See id.* at 54. There is no need under the circumstances for the Court to resolve this discrepancy, if it is such. *See infra.*

**25.** The Hunter Limited Partnership has two general partners, Hunter Publishing and IR Publishing.

partners could expect 245% to 300% in capital appreciation over a five-year period, that Hunter would launch an aggressive acquisition strategy to achieve growth and diversity, and that Hunter would be managed by "seasoned" veterans with a long and successful record in the media. The Plaintiffs allege that the $10 million investment, "because of Hunter Publishing's inability to continue as a going concern, [was] inflated and worth substantially less than $10 million." The Plaintiffs also allege that since Hunter could not pay off its debt at the time of the Offering, it could not be reasonably expected to pay any significant return on its equity. They claim that Hunter had already been unable to obtain additional financing, and that Defendants Stein and Pompadur lacked ability and experience. Finally, they allege that Integrated, as the ultimate sponsor of the offering, was represented as an entity with more than $1.8 billion in assets, whereas a sizable portion of its "assets" consisted of now-worthless receivables from other partnerships, and that the Defendants' failure to disclose the financial condition of Integrated was a material omission. Since Integrated (which has filed for relief under chapter 11 of the bankruptcy code) is not a party to this action, and since the Plaintiffs have not alleged how Hunter knew of Integrated's financial problems, this last claim will not be considered by this Court in any of these actions.

▮ The Plaintiffs charge the "Promoter Defendants" (all Defendants save IR Credit and Touche) with violations of § 12(2) of the 1933 Act and § 10(b) of the 1934 Act, common law fraud, negligence, and breach of fiduciary duty in connection with the sale to them of their interests in Hunter Publishing, and they request an equitable accounting as a separate claim. They charge Touche with a primary violation of § 10(b), common law fraud, and negligence for allegedly misleading financial statements included in the Offering Materials. They also charge the associate general partner IR Publishing (itself a limited partnership), IR Publishing's own general partner IR, and Integrated with violations under the RICO statute, 18 U.S.C. § 1961 et seq. They name IR Credit as a defendant to claim declaratory relief under 28 U.S.C. §§ 2201–02 to the effect that none of the Plaintiffs need pay off any promissory notes still owed to the Hunter Partnership.

### B. Discussion

#### 1. Going Concern Qualification

The Plaintiffs allege five separate misleading statements on the part of the Promoter Defendants: (1) that the managing general partner would contribute $10 million in equity; (2) that the Limited Partners would receive projected distributions of 6% per year and could expect up to a 300% capital appreciation in the next five years; (3) that Hunter would launch an aggressive acquisition strategy; (4) that Hunter had previously been successfully operated; and the (5) Hunter would be managed by "seasoned" veterans.

The first allegation is the most important one and is tied to the alleged failure of Touche to include "going concern" qualification. The Plaintiffs make what is apparently a novel claim: They allege that the $10 million in assets was not worth its face value, not because the worth of any particular category of assets was falsified or fraudulent, but because the assets were "in effect" overvalued (since the Defendants knew that Hunter could not continue as a going concern). If the assets of the Hunter Partnership had been valued at liquidation or "distress-sale" prices, as the Plaintiffs claim they should have been, the $10 million in existing assets would have been worth considerably less.

The Plaintiffs have supplied this $10 million figure, for the Hunter PPM merely states that "[a]t such time as the first investor is admitted to the Partnership, the Managing General Partner [Hunter Publishing] will contribute all of the assets of the Managing General Partner to the Partnership, and the Partnership will assume all liabilities of the Managing General Partner relating to the Business...." Hunter PPM at 8 & 53. The Plaintiffs have valued all the assets of the old Hunter Publishing at $10 million by making this calculation: "The Memorandum [Hunter PPM] stated that the business was worth $34.0 million. This implied that since the Bank was owed $22.5 million, the Busi-

ness had equity of over $10 million." Pls.' Mem. in Opp. at 68.

The Hunter PPM states that Pompadur and Stein purchased Hunter in the Initial Acquisition pursuant to two appraisals "prepared by an independent appraiser which provide[d] that the assets of the Business were valued using the residual method provided by Section 33(b)(5) of the [Internal Revenue] code." Hunter PPM at 52. The value of the first appraisal is not given; the second, dated as of August 25, 1986, reflected a $37 million value. The Hunter PPM continues:

> In connection with this offering the firm of Kane–Reece Associates, Inc. has rendered an appraisal that updates the [second] Appraisal as of July 1, 1988 (the "Updated Appraisal"). The valuation of the assets of the Business as reflected in the Updated Appraisal is $34 million.... The primary reason for the decline in such value ... results from the fact that actual operating cash flow of the Business for the year ended December 31, 1987 was less than that which was anticipated at the time.... The Partnership is in possession of the Updated Appraisal. Investors are urged to review the Updated Appraisal in its entirety.

Hunter PPM at 52–53. The Updated Appraisal was not included in the Hunter PPM, although (as was customary for Integrated) the memoranda invited potential purchasers to obtain it and other additional information. While the Plaintiffs imply the appraisal was fraudulent ("The defendants obtained an appraisal which ignored the debt problems and valued the business at $34 million", Pls.' Mem. in Opp. at 69), they do not claim that it was, in fact, fraudulent, and they have not named the appraisers as defendants. In effect, the Plaintiffs allege that $10 million in assets supplied to the Partnership became worth much less simply because "the business the Partnership was acquiring had failed, ... when they knew that controlling accounting principles required [the assets] only be valued in a distressed sale context." *Id.* at 67.

Thus the major claim of fraud against the Promoter Defendants relates to the claim of § 10(b) fraud against Touche, for if Touche had qualified its opinions with a "going concern" hedge, the assets of Hunter would have been seen for what they were truly worth. The primary question, then, is whether Touche is liable for securities fraud for not having included a "going concern" qualification with its financial statements.

### 2. The Plaintiffs' Claims Against Touche

Although the Plaintiffs condemn Touche for financial statements extending over three calendar years ("Touche prepared (a) Certified Financial Statements for the year ending 1987 and the last four months of 1986, and (b) an unaudited set of financial for the first four months of 1988," 2d Am.Compl. ¶ 62), Touche may be liable only for the items listed by Plaintiffs under (a). An unaudited set of financial is precisely that: "It is substantially less in scope than an examination in accordance with generally accepted auditing standards.... Accordingly, we do not express such an opinion," namely, an opinion on whether the statements are in accordance with generally accepted accounting principles. Opinion Letter of Touche Ross Dated July 12, 1988, *quoted in* Hunter PPM at 205. This is a disclaimer of opinion, which by definition cannot be considered as either an unqualified opinion or as a qualified opinion and cannot have been relied on by the Plaintiffs.

To allege fraud in overvaluing the assets listed in the 1987 and 1986 financial statements prepared by Touche, the Plaintiffs must allege at least the accounting value which governs the way in which the assets are carried, or which calls for a writedown to market value at a particular time. *See Quantum Overseas,* 663 F.Supp. at 666–67. The Plaintiffs must allege "what accounting practices should have been used," *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd without op.,* 697 F.2d 296 (2d Cir.1982), how these practices were not followed, and what practices should have been used in their place.[26]

---

26. In *Posner,* the plaintiff claimed that an accounting method, the "percentage of comple-

tion" method to report sales, was improper because the defendants knew of the nonviability of

The accounting principle the Plaintiffs cite here is the Auditing Standards Board's ("ASB") Statement on Auditing Standards ("SAS") Nos. 34, 59.[27] The relevant portion of SAS No. 34 reads:

> In an examination of financial statements in accordance with generally accepted auditing standards, the auditor does not search for evidential matter relating to the entity's continued existence because . . . an entity's continuation is usually assumed. . . . Nevertheless . . . in forming an opinion on the financial statements, the auditor considers any such contrary information, together with any factors tending to mitigate that information and any management plans for dealing with the underlying conditions.

SAS No. 34 at ¶ 3. Certain items which are listed as "contrary information" by SAS No. 34 (¶ 4(a)) were undeniably present: Hunter's 1987 financial and the Hunter PPM itself reveal "negative trends" such as working capital deficiencies and two instances of missed loan payments. *See* Hunter PPM at 54. However, several of the mitigating factors were also present, including "Consideration of Management Plans," SAS No. 34 at ¶ 5, which (among others) specifically refers the auditor to consider the "feasibility of plans to increase ownership equity, including existing or committed arrangements to raise additional capital." SAS No. 34 also states that:

> Particular emphasis ordinarily is placed on [management] plans that might have a significant effect on the entity's solvency within a period of one year following the date of the financial statements on which the auditor is currently reporting. . . . The auditor's function, however, does not include predicting the outcome of future

events, and an unqualified opinion on the financial statements does not constitute a guarantee or assurance by the auditor that the entity has the ability to continue for any particular period beyond the date of his opinion.

SAS No. 34 at ¶¶ 8 & 9. This suggests both that the auditor's obligation does not extend beyond one year, and in any event, it is left altogether to the auditor's professional judgment.

The Plaintiffs have not alleged how Touche violated this standard nor any facts to indicate that any liabilities were undisclosed or that any particular numbers on the balance sheet were fraudulent or that Hunter was not a going concern a year later. Shareholders' equity and working capital were both negative, but this was fully revealed in the 1987 balance sheet. *See* Hunter PPM at 193. The Plaintiffs have not alleged any financial analyses that the auditors should have conducted or conducted fraudulently, any ratios they failed to calculate or include which would have alerted a reasonable investor, any other risks factors which may have been concealed, or any negligent behavior on the part of the accountants at all. "Identifying the point at which uncertainties about recoverability, classifications, and amounts require the auditor to modify his report is a complex professional judgment. No single factor or combination of factors is controlling." SAS No. 34 at ¶ 11. The Plaintiffs have cited no undisclosed factors which could be controlling and which therefore would demonstrate that Touche violated SAS No. 34.

### 3. The Plaintiffs' Claims Against the Promoter Defendants

The first claim against the Promoter Defendants, as previously set forth, relate to the

---

the project and therefore of their own inability to complete orders. The court held that, since it was "not dealing with a concrete fact, but rather with a conclusion: 'that the process . . . was not economically viable,'" the accounting method chosen was valid unless the plaintiff could show some fact indicating that it was impossible at that time to complete the sales orders. *Id.* at 769. "Not everyone reaches a conclusion at the same time, and liability to purchasers of stock would arise only after the conclusion was reached and additional material misstatements were made." *Id.*

27. The accounting principle cited by the Plaintiffs, ASB's SAS 34, AU 340, "The Auditor's Considerations When a Question Arises About an Entity's Continued Existence," ¶ 77(a), was superseded in April 1988 by a new SAS No. 59, "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern." SAS No. 34 applies here, however, for SAS No. 59 applies only to periods beginning on or after January 1, 1989.

value of the $10 million contribution. Aside from the going concern qualification just considered, no allegations of fraud have been specified with respect to this first claim and it is, therefore, dismissed.

Beyond the absence of a "going concern" qualification, however, the Plaintiffs allege four other misrepresentations against the Promoter Defendants. First, they contend that they were misled to believe that partners *would* receive a 6% yearly distribution and a 245%–300% capital appreciation over a 5–year period. *See* Hunter 2d Am.Compl. ¶ 30. The Plaintiffs do not say where in the Offering Materials the Defendants explicitly guaranteed this return. In fact, warnings in the Hunter PPM stated:

> There can be no assurance that the partnership will operate profitably. In addition, there can be no assurance that investors will realize any return on their investment. [Hunter PPM at v.]

> No representations or warranties of any kind are made or intended to be made, nor should any be inferred, with respect to the economic return or the tax attributes of an investment in the partnership. [Hunter PPM at vii.]

> Only investors meeting the conditions set forth under the heading "*Who May Invest*" may purchase units. An investment in the partnership entails significant risks. [Hunter PPM at v.]

Potential investors were advised that the investment was inappropriate for investors seeking liquidity or predetermined amounts of return: "An investment in the partnership is not appropriate for investors seeking liquidity or any predetermined amount of aggregate cash return." Hunter PPM at 22 (at "Who May Invest," "Investment Considerations" and "Borrowing Option Available to Investors").

Under the heading "*General Business Considerations—Competition,*" the following notification was set forth:

> There can be no assurance that the Partnership will operate profitably. The future performance of the Partnership will be subject to the prevailing economic conditions and the ability to locate and acquire additional publications. The performance of the Partnership will be subject to financial, business and other factors beyond its control, including competition from present competitors (many of which are substantially larger, and have substantially greater resources, than the partnership) and technological advances and changes in the communication, media, advertising and other related industries in which the Partnership operates....

Hunter PPM at 23 (*see* "The Business"). Under the heading "*Publishing Industry,*" another notification was set forth:

> The performance of the Partnership may be negatively effected [sic] by certain factors relating to the publishing industry outside the control of the Partnership. These factors include potential increases in the cost of raw materials such as paper and ink, increases in applicable postal rates and weakness in the advertising markets in general. In addition, the Partnership may be negatively affected by weakness in industries served by the Partnership's publications (such as the oil and gas and automotive industries), weakness in the markets for goods advertised and competition by both other publications and other media for available advertising dollars.

Hunter PPM at 24. Under the heading "*Working Capital,*" still another warning read:

> There can be no assurance that the Partnership will have sufficient working capital. A deficiency of working capital might be caused, for example, by a decrease in gross revenues or by an increase in expenses. There can be no assurance that the Partnership will be able to borrow funds in addition to those available to it under the Bank Loan. In addition, there can be no assurance that the Partnership will be able to replace that line of credit after its anticipated expiration on June 30, 1996.

Hunter PPM at 24–25 (*see* "Financing" under "The Business"). Under the heading "*Profitability—Variances from Forecasts and Projections,*" the Hunter PPM provided:

> There can be no assurance that the Partnership will attain the operating results forecasted in Schedule A hereto. The

forecasts and projections contained in Schedules A, B and C to this Confidential Memorandum *are based on the estimates and assumptions set forth therein.* Although the General Partners believe those estimates and assumptions to be reasonable, *some of the estimates or assumptions may prove to be inaccurate ....* In any event, the actual results of future operations of the Partnership likely will vary from those set forth in the forecasts and projections, and such variations may be material.

Hunter PPM at 25–26. As warnings go, these are sufficient to defeat the claim based on allegations of future performance.

It is true that caveats about the projections do not insulate the Promoter Defendants from fraud. However, the warnings show that future presentations are merely projections, not statements of fact upon which the Plaintiffs can rely. Future misrepresentations may be misleading despite warnings only if based on present fraudulent numbers or present fraudulent facts or omissions. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). None such are alleged here. A projection of future prospects which "bespeaks caution" is not actionable. *See Haggerty v. Comstock Gold Co.,* 765 F.Supp. 111, 114 (S.D.N.Y.1991); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 162 (S.D.N.Y.1990); *see also In re Donald J. Trump Casino Sec. Litig.,* 793 F.Supp. 543, 549–52 (D.N.J.1992) (comprehensive discussion of how virtually every circuit has come to agree with the emerging "bespeak caution" trend in the law).

The Plaintiffs' second claim is that they were misled into believing the Partnership would be profitable because they were allegedly told that the Partnership was going to launch an "aggressive acquisition strategy." Such a statement cannot be actionable as a guaranty of future profitability. All it should do is put the potential investor on notice that the partnership was a high-risk enterprise; an aggressive acquisition strategy guarantees immediate inroads into investment capital.

The Plaintiffs allege in their third claim that, contrary to fact, the Defendants claimed

that Hunter had been successfully operated in the past. Although Hunter had been losing money, its financial statements clearly revealed this. Hunter had missed two debt payments in the recent past, but the Hunter PPM stated this. *See* Hunter PPM at 53–5.

Finally, the Plaintiffs allege they were told that Hunter would be managed by "seasoned" veterans. Brief curricula vitae of both Pompadur and Stein were included in the Hunter PPM at 61–62, and the Plaintiffs have not alleged what portions, if any, of that information was false. The Plaintiffs also allege that Pompadur and Stein's "true purpose" was merely to rid themselves of a losing investment. However, when the facts are fully revealed in the offering memorandum, that purpose is not actionable. *See Bucher v. Shumway,* [1979–80 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y. Oct. 12, 1979). The current finances of the business at the time were fully revealed, as were all transactions of Stein and Pompadur; therefore their motive, as such, is irrelevant. *See Lavin v. Data Systems Analysts, Inc.,* 443 F.Supp. 104 (E.D.Pa.1977), *aff'd. without op.,* 578 F.2d 1374 (3d Cir.1978).

### 4. Plaintiffs' §§ 10(b) and 12(2) Claims Are Dismissed With Prejudice

The Plaintiffs' claims are directly contradicted by warnings and notifications contained in the Offering Materials. These warnings and notifications were set out with underscored subject headings, they were listed in capitalized letters for the first few pages of the Hunter PPM, and they were often cross-referenced to other risk notification sections throughout. Under these circumstances, Plaintiffs have not made out a case of fraud with sufficient particularity to pass muster under Rule 9(b).

In prior proceedings in this case, Judge Stanton twice orally directed the Plaintiffs to replead their Complaint with more particularity. They have repleaded their Complaint now for the second time with no better result. The Plaintiffs have had ample opportunity to remedy the flaws in their pleading, but they have not done so. Therefore, this Court hereby dismisses the §§ 10(b) and

12(2) claims set forth in the *Hunter Publishing* Plaintiffs' Second Amended Complaint with prejudice.

## II. Lenox Towers

### A. *Prior Proceedings*

The *Lenox Towers* action differs from the others since, as explained *supra* in Global I § III.D.1., a decision in that case has already been rendered by the Honorable Louis H. Stanton in *Martin*, 1991 WL 131176, 1991 U.S.Dist. LEXIS 9234. This decision is part of the law of the case, and familiarity with it is assumed. Judge Stanton concluded that, should the Plaintiffs' claim that the Defendants had failed to inform the Plaintiffs that previous limited partnership offerings had failed to sell out prove to be true, the Plaintiffs had pleaded a material omission sufficient to withstand a motion to dismiss. However, since he also found that the Plaintiffs had not pleaded fraud with the particularity required of them by Rule 9(b), Fed.R.Civ.P., he dismissed the Complaint as to all Defendants except IREC. *See Martin*, 1991 WL 131176, at *3, *4, 1991 U.S.Dist. LEXIS 9234, at *5–*7, *12–*13.

The Plaintiffs have since then filed an Amended Complaint, which is now opposed by the Defendants on the grounds of statute of limitations, *see* Global Motion I § III.D.1, failure to state a claim, and failure to plead fraud with particularity. The Defendants do not oppose the determination that the nondisclosure of the prior failure of other limited partnerships was a material omission, and accordingly that point is not addressed here. The Moving Defendants oppose the Plaintiffs' other allegations of material misstatement and nondisclosure, and it is these allegations which this Court considers for dismissal now.

### B. *Facts*

Unlike *Hunter Publishing,* which was essentially a refinancing of a leveraged buyout, the facts in *Lenox Towers* seem more typical of the type of commercial real estate offering which Integrated often sponsored. The Lenox Towers Associates Limited Partnership (the "Partnership") was syndicated on February 15, 1989, to acquire, own and operate two 17–story office towers together with a 72–year leasehold interest in the underlying land (the "Lenox Property") located in Atlanta, Georgia. The Lenox Property comprised two nearly identical buildings originally built in the 1960s, but recently renovated, and a commercial garage.

Integrated syndicated the Lenox property through the same wholly-owned subsidiary as in Hunter Publishing (Integrated Resources Equity Corporation, or "IREC"), using essentially the same partnership structure. Through a private placement memoranda dated February 15, 1989 (the "Lenox PPM") and two investment summaries dated September, 1988 and March, 1989 (collectively the "Offering Materials"), Plaintiffs were offered 155 units at $99,000 per unit, on the condition that they warranted that their purchase of the interests would maintain the partnership's exemption from registration under the federal securities laws. As in the offering in *Hunter,* purchasers were given the option of paying in cash or in a combination of cash and promissory notes offered by IR Lenox Credit Corporation ("Lenox Credit"). Unlike the offering in *Hunter,* however, the *Lenox Towers* Defendants did not state that the Offering would be withdrawn and all purchases cancelled if all partnership units were not sold. By November 1989 only 49 of the 155 units offered had been sold, and the Defendants began to look elsewhere for financing. Although the Partnership acquired additional financing via commercial bank loans, the Plaintiffs have alleged that their partnership interests now have little or no worth.

### C. *Discussion*
#### 1. The Plaintiffs' §§ 10(b) and 12(2) Claims

■ The Plaintiffs' §§ 10(b) and 12(2) claims are again insufficiently pleaded to pass muster under Rule 9(b). The Plaintiffs' §§ 10(b) and 12(2) allegations, which are subject to the motion to dismiss, essentially state that the Defendants misrepresented and failed to disclose the possibility that the limited partnership units would fail to sell out completely. They also allege that they were

told that if additional financing proved necessary, the Partnership would borrow from Integrated or an affiliate, and not from an outside lender as it actually did. Finally, they also allege that the Lenox PPM misrepresented the projected occupancy and rental rates of the project, and that these projections contradicted the results of an internal analysis of the property prepared by Integrated itself in December 1988.

As stated above in Global I § III.D.1., the Lenox PPM explicitly warned that the offering might be undersubscribed and that the Partnership had the option of borrowing any shortfall from outside lenders. The Lenox PPM warned in three places that if all the units were not sold, amounts borrowed to cover Lenox cash requirements would remain outstanding. *See* Lenox PPM at ii, 9 & 15. The Lenox PPM made it clear that certain financial obligations would accrue "assuming all of the interests are sold" and "assuming the sale of all interests." (Lenox PPM at 3). The Lenox PPM always represented that Integrated would loan the Partnership any necessary money "if possible," and Plaintiffs have pointed to no guarantees that Integrated would always do so. "[N]o liability attaches to an offering memorandum that purports to be speculative." *Stevens,* 694 F.Supp. at 1063.

The Plaintiffs contend that the Lenox PPM misrepresented the projected occupancy and rental rates of the project. Projections, in the context of a securities offering, are promises; and promises are actionable only if the defendant knows they are false when he makes them. *See Luce,* 802 F.2d at 56. A promise of future income will be false when made if it is based on current facts which are falsely misrepresented in order to support the projections. *See Virginia Bankshares, Inc. v. Sandberg,* — U.S. —, —, 111 S.Ct. 2749, 115 L.Ed.2d 929, 948 (1991). To label a projection which does not pan out "fraud" merely because it turned out not to be true is "fraud by hindsight," in Judge Friendly's famous phrase. *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). Some aspect of the projection must be actually false, and known to be false to the defendant making the promise at the time it was made, for the projection to be fraudulent.

The projections in *Luce* which were held not to be fraudulent were hedged with cautionary language, which made it clear that projections were "necessarily speculative in nature," and the court stated that "[w]e are not inclined to impose liability on the basis of statements that 'bespeak caution.'" *Luce,* 802 F.2d at 56. The rationale is that if projections can be misleading if they are portrayed as certainties, they cannot be misleading if all the risks and uncertainties accompanying the investment are fully revealed. The result is the "bespeak caution" approach to federal securities fraud claims:

> The essence of the doctrine is that where an offering statement, such as a prospectus, accompanies statements of its future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud. Within the past thirteen months, five circuit courts have adopted this approach to evaluating the actionability of a federal securities fraud claim based on future projections contained in a prospectus or other offering statement.

*Trump Casino,* 793 F.Supp. at 549 (citations omitted); *see also id.* (citing *Luce* as a seminal case for the "bespeak caution" doctrine). "[C]ourts in this Circuit have repeatedly held that, with respect to future projections, there is no liability under § 10(b) for statements in an offering memorandum that 'bespeaks caution.'" *Haggerty,* 765 F.Supp. at 114.

However, employing statements which "bespeak caution" does not automatically absolve the defendants of liability for any securities violation. Fraud is still fraud, and all the cautionary language in the world will not replace a true material omission or misstatement of a fact which would matter to a reasonable investor. But adequate cautionary language may be the equivalent of full disclosure for predictions, since it should tell a reasonable investor how far he may rely on management's usually glowing predictions. "[W]arnings and disclaimers may limit the extent to which an investor can rely on the offering documents as a forecast of future events." *Griffin v. McNiff,* 744 F.Supp.

1237, 1253 (S.D.N.Y.1990); *see CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 162 (S.D.N.Y.1990); *Friedman v. Arizona World Nurseries Limited Partnership,* 730 F.Supp. 521, 541 (S.D.N.Y.1990), *aff'd without op.,* 927 F.2d 594 (2d Cir.1991).

The Lenox PPM in the *Lenox Towers* Offering Materials characterized projected rent rate increases of 3% to 6% as "assumptions" and explicitly stated that, "[b]ecause the successful operation of the property will depend upon many factors over which the Partnership will have little or no control, no assurance can be given that future operating results will match the forecasts contained herein." Lenox PPM ¶ 7. The same warning was repeated at the beginning, Lenox PPM at iii, and in the "Risk Factors" section of the Lenox PPM, *id.* at 32. The competition in office space in the vicinity of Atlanta and problems of traffic congestion around the property were disclosed in the "Office Market Overview," appended to the Lenox PPM. *See* Lenox PPM Ex. 3 at 192–97.

██ The Plaintiffs cite but one example of anything approaching a material omission. They allege that an internal analysis of the property prepared by Integrated stated that it was "unrealistic" to assume the property could achieve 95% occupancy. According to the Defendants, the internal analysis simply stated that it was "realistic" that 1989 would be a tough leasing year, but that 95% leasing by December 1, 1989 was still the "primary goal" which would be "aggressively" pursued.[28] The Plaintiffs still have cited no statements in the internal analysis to support allegations of knowledge of misstatements on the part of the Defendants. Since this cita-

tion to the internal analysis is the closest the Plaintiffs' Complaint comes to specific allegations of fraud, the Plaintiffs' Complaint is dismissed for failure to plead fraud with particularity pursuant to Rule 9(b).

### 2. The Plaintiffs' Cross–Motion Against the Defendants' Counterclaims is Granted

██ The two named Plaintiffs in *Lenox Towers,* Jules Martin and Frances M. Donovan, each executed a Subscription Agreement on May 25, 1989 and May 17, 1989. These Agreements were required from each Investor as a prerequisite to purchasing any limited partnership interests. In Section 6 of every Subscription Agreement, each Investor warranted, among other things, that (1) each relied only upon the Offering Materials for information, (2) each has consulted with an attorney or accountant who had reviewed and analyzed the offering, (3) each understood that the financial projections were based only on certain assumptions and did not purport to be a representation of the effects of any investment in the Partnership, and (4) each was able to bear the economic risk of an investment in the Partnership. As investors, moreover, both Plaintiffs agreed to indemnify the Defendants for any breach of these warranties:

> [Plaintiffs would] indemnify and hold harmless the Partnership, the General Partner, Credit Corp., Integrated, any natural person, corporation or entity affiliated with any of the above ... from and against any and all loss, damage, liability or expense, including costs and reasonable at-

---

**28.** The "internal analysis" has been placed before this Court as part of one of the Defendants' Affidavits, the Robert Pees Affidavit. The Court may rely on it since the Plaintiffs have incorporated it by reference into their Complaint. *See Shumate v. McNiff,* Fed.Sec.L.Rep. (CCH) ¶ 95,916, 1991 WL 42184 (S.D.N.Y.1991). Entitled "Lenox Towers Marketing Plan for 1989," and dated December 9, 1988, the contested statement actually reads:

> The primary objective will be to have Lenox Towers 95% leased by December 31, 1989, or sooner if possible. In addition to aggressively pursuing this projected leasing schedule, it will be the objective of this marketing program to procure the most desirable tenants possible

and realize the optimum leasing terms allowed by the market.

> While achieving a 95% occupancy level always remains our focus at all times, to be absolutely realistic, 1989 will be a tough leasing year due to the fact that there is 47,412 rentable square feet of known vacancies coming up ... (Exhibit B).

Exhibit B to the internal analysis marketing plan listed 6 tenants who had notified the Partnership that they would not renew. The information in Exhibit B, *i.e.,* the nonrenewing tenants' names and the amount of space each would no longer be leasing, was revealed to investors in the Lenox PPM at 54, under the heading, "The Space Leases."

torneys' fees to which the Partnership or such other person may be put or which it may incur by reason of or in connection with any misrepresentation made by the undersigned or any breach of any of his warranties or his failure to fulfill any of his covenants or agreements under this Agreement or the Partnership Agreement.

Lenox Towers Subscription Agreement § 7, ¶ 8.

Alleging that the claims filed by the Plaintiffs in this lawsuit demonstrate the Plaintiffs' breach of these warranties, the Defendants have counterclaimed for their costs and legal fees pursuant to this indemnity clause. The Defendants specifically allege that the Plaintiffs breached the first warranty by relying on "an investment summary dated September, 1988 and March, 1989," Am.Compl. ¶ 4, and written and oral communications instead of only on the offering materials. They allege that the Plaintiffs breached the second by failing to analyze the Lenox PPM, for the Lenox PPM openly stated that all partnership units might not be sold, that traffic was a problem for businesses thinking of renting space in the Lenox Property, and that the commercial real estate market in Atlanta was competitive. They allege that the Plaintiffs breached the third when the Plaintiffs pleaded reliance upon the financial projections. Finally, they allege that the Plaintiffs breached the fourth by claiming now that they could not afford to lose the money that they lost.

The Defendants' counterclaims, unlike the Plaintiffs' claims, do give the Plaintiffs fair notice of what their claims are and the grounds upon which those claims rest. See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Although § 14 of the 1933 Act, 15 U.S.C. § 77n, and § 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a), provide that any provision binding any buyer of securities to waive compliance with the federal securities laws or rules is void, the indemnity provision escapes this fate because it explicitly states that the Plaintiffs retain all their rights under the federal securities laws. Nevertheless, as a matter of law, the Defendants' counterclaims must be dismissed since the indemnity agreement at issue here does not encompass the right of the Defendants to recover their attorneys' fees expended in their successful defense. The Defendants still may be entitled to reasonable attorneys' fees pursuant to § 11(e) of the 1933 Act, 15 U.S.C. § 77k(e) (which allows defendants' costs provided plaintiffs' securities claims prove frivolous), but they cannot collect them under this indemnity agreement for the reasons stated below.

The leading opinion on the issue in the Second Circuit is Zissu v. Bear, Stearns & Co., 805 F.2d 75 (2d Cir.1986) ("Zissu II"). There the Court considered in detail the "troubling question involving an apparent inherent contrariety between" plaintiffs' nonwaiver of the right to sue on securities fraud and an indemnity clause protecting sponsors from plaintiffs' breach of warranty clause in the same agreement. The court in Zissu II concluded that while the indemnity agreement was too vague to put the plaintiff in that case on notice that he might have to pay the defendants' attorneys' fees, plaintiff's lawsuit was frivolous within the meaning of § 11(e), and so the district court's award of attorney's fees could stand.

Here that does not seem to be the case, for this indemnity agreement, unlike the one at issue in Zissu II, explicitly states that the Plaintiffs will be liable for the Defendants' attorney's fees. However, other courts in other circuits have followed Zissu II and yet held that even when an indemnity agreement such as this one does explicitly mention attorneys' fees, it still does not put plaintiffs on notice that they must pay defendants' attorneys' fees unless their case is frivolous. See Stratmore v. Combs, 723 F.Supp. 458 (N.D.Cal.1989), aff'd sub nom. Layman v. Combs, 981 F.2d 1093 (9th Cir.1992); Fulco v. Continental Cablevision, Inc., Fed.Sec. L.Rep. (CCH) ¶ 95,345, 1990 WL 120689 (D.Mass.1990).

The district court opinion in Zissu considered plaintiff's warranties to be a pure contract claim. One of the purposes of the contract, to be sure, was to make certain that the plaintiff's investment preserved that private offering's exemption from the requirements of registration under SEC Rule 146, 17 C.F.R. § 230.146), but that was not deter-

minative. *See Zissu v. Bear Stearns & Co.,* 627 F.Supp. 687, 693 (S.D.N.Y.1986) ("*Zissu I* "), *aff'd on other grounds,* 805 F.2d 75 (2d Cir.1986). The Court of Appeals stated:

> [T]he warranties in question were necessary to exempt the limited partnership from the requirements of the 1933 Act and are so understood by investors. That being the case, the parties had little reason to expect that such warranties might also be the basis for the counterclaim made in the present case. Thus, although New York courts have held that contractual indemnity provisions for attorneys' fees will be enforced, and broad indemnification provisions like the one here should be read to extend to such fees ... a higher level of specificity is required when attorneys' fees are being assessed against a plaintiff suing for securities fraud.

*Zissu II,* 805 F.2d at 79–80 (citations omitted).

In other circuits, merely including the mention of attorney's fees in the list of items for which a plaintiff promises indemnification does not reach the requisite level of specificity. In *Stratmore,* 723 F.Supp. 458 (N.D.Cal. 1989), the court construed an indemnity clause which was part of a limited partnership agreement and which did mention attorneys' fees. The relevant portions of the indemnity clause read:

> The Subscriber hereby agrees to indemnify and hold harmless the Company, the Sellers and agents of each of them from and against any losses, claims, damages, liabilities, expenses (including attorneys' reasonable fees and disbursements), judgements [sic] and amounts paid in settlement resulting from the untruth of any of the warranties....

*Stratmore,* 723 F.Supp. at 460. The Court wrote in *Stratmore:*

> Sellers should not be absolutely barred from enforcing by indemnity agreements the warranties and representations made by buyers. However, as the *Zissu* court stated, if those indemnity provisions are to include defendants' attorneys' fees incurred in suit by buyers for securities laws violations, such an inclusion should be very clear.

> Defendants here argue that this indemnity clause explicitly mentions attorneys' fees, unlike the one in *Zissu.* Therefore, defendants believe that this indemnity provision was specific. However, the reasoning in *Zissu* went beyond the mere presence or absence of the words "attorneys fees" in the clause. The court pointed out that the main purpose of the warranties and representations was to protect the private placement exemption, as it is here. In that context, plaintiffs had little reason to anticipate that the indemnity provision would apply to suits by the buyers themselves against the sellers for securities act violations.

*Id.,* 723 F.Supp. at 463.

The argument that a clause designed to preserve an exemption does not put plaintiffs on notice is probably a stronger argument than the "public policy" reason cited in other opinions, such as *Doody v. E.F. Hutton & Co.,* 587 F.Supp. 829, 833 (D.Minn.1984) ("The Court finds that enforcing an indemnity provision such as [this] one ... would discourage prospective plaintiffs from bringing securities fraud actions"); *Barnebey v. E.F. Hutton & Co.,* 715 F.Supp. 1512, 1522 (M.D.Fla.1989) (denying plaintiffs' public policy argument because of *Zissu II* but nevertheless denying summary judgement in favor of defendants). The public policy argument—that enforcing such agreements would discourage legitimate securities fraud actions—is too absolute. Where possible, the securities laws should not be construed against freedom of contract.[29] Nor would

---

**29.** *Compare* the reasoning in *Wilko v. Swan,* 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168 (1953) (holding that the arbitration of securities claims was forbidden by the grant of exclusive jurisdiction to federal courts in § 22 of the 1933 Act) *with Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 233–34, 238, 107 S.Ct. 2332, 2341, 96 L.Ed.2d 185 (1987) (construing

§ 27 of the 1934 Act and narrowly reading *Wilko* as barring waiver of a judicial forum only where arbitration is inadequate to protect the substantive rights at issue) *and Rodriguez de Quijas v. Shearson/American Express Inc.,* 490 U.S. 477, 481, 484–85, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) (overruling *Wilko* as concep-

the statement in *Zissu II* that a higher level of specificity would be required make sense if such indemnity clauses could not be enforced altogether.

Therefore, under the circumstances of this contractual language, the Defendants cannot assert a claim for indemnification of attorney's fees and other costs unless the Plaintiffs' claim is frivolous, in which case they are entitled to costs under § 11(e).

■ Parties in these actions who *may* assert claims for indemnification under such agreements are third-party beneficiaries. *See MFS Managed High Yield Municipal Bond Trust v. Osteopathic Hospital Association, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 94,375, 1989 WL 73217 (D.Mass.1989) ("defendants correctly argue that they were third-party beneficiaries, entitled to enforce the representations and warranties made by plaintiffs"); *Samuels v. Wilder*, 871 F.2d 1346, 1353 (7th Cir.1989) (plaintiffs must indemnify nominee for actions brought due to owner's participation in the investment scheme). This is nothing more than the traditional law of indemnity (often an agreement between two parties to shift the risk to the real party in interest) in the context of securities law. *See Colon v. Automatic Retailers Ass'n Serv., Inc.*, 74 Misc.2d 478, 343 N.Y.S.2d 874 (Civ.Ct.1972) (general discussion of the law of indemnity in New York).

### 3. The Plaintiffs' §§ 10(b) and 12(2) Claims are Dismissed With Prejudice

In light of the fact that the Complaint in *Lenox Towers* was previously amended following the dismissal of Claims I through VII [30] of the original Complaint for failure to comply with the pleading requirements of Rule 9(b), Fed.R.Civ.P., *see Martin*, 1991 WL 131176, at *5, 1991 U.S.Dist. LEXIS 9234, at *14, the Moving Defendants' Global Motion II is granted, and the *Lenox Towers* Plaintiffs' §§ 10(b) and 12(2) claims are dismissed with prejudice as to all Defendants.

tually obsolete and practically incompatible with *McMahon* ).

### III. Southern Inns

Applying the relevant statutes of limitations to this action had whittled the number of Plaintiffs in this action down to ten and the number of Defendants down to four. The ten Plaintiffs are the nine Florida Plaintiffs and the one Illinois Plaintiff whose claims were brought or added before June 19, 1991, the date in § 27A. The Florida Plaintiffs are Joan Agurcia, Leonard C. and Ruth M. Gaderton, Richard and Henrietta House, Rhona Miller, Mary F. Walker, the Elizabeth J. Walker Trust, and Jim Weldon. The Illinois Plaintiff is Bhurji Singh. The four original defendants also remain: Integrated's wholly-owned subsidiary IREC, the Southern Inns Associates Limited Partnership (the "Partnership"), IR Southern Inns Credit Corporation ("Southern Credit Corp."), and Sevzar Associates ("Sevzar"), a Connecticut partnership which is one of three general partners in the Partnership. The Plaintiffs' claims against the additional Defendants do not relate back as is explained above. *See supra* Global Motion I § III.B.

#### A. Facts

The facts and the Plaintiffs' claims in *Southern Inns* are virtually identical to those in *Lenox Towers*. The Plaintiffs allege that the Defendants organized the Partnership in June, 1988, to purchase, own, and operate seven Comfort Inn motels in the Carolinas and Virginia (the "Properties") (*see supra* Global I § III.D.2.) The Properties were syndicated by a private placement memorandum (the "Southern Inns PPM") and an investment summary (collectively the "Offering Materials"). As in *Lenox Towers*, purchasers could buy with cash or with cash and a promissory note financed by Southern Credit Corp. Each unit was priced at $99,500. The Plaintiffs allege that Defendants could sell only 55.5 out of 128 units offered, or 43% of the Offering. It is clear that, as in *Lenox Towers*, the Defendants had not sold all the units by late 1989 and borrowed money from outside lenders to cover the shortfall. The Plaintiffs have alleged that the Partnership has failed, that their investments are now

**30.** Claim I was dismissed as to all defendants except IREC.

worthless, and that four of the seven Properties have been lost to foreclosures.

### B. *Discussion*

The core of the Plaintiffs' allegations in *Southern Inns* is the same as it was in *Lenox Towers:* They allege that the Defendants falsely represented that the partnership would sell out completely and that, if it did not, Integrated or an affiliate would be willing and able to advance any necessary money.

The Plaintiffs' § 10(b) claims in the Third Amended Complaint of *Southern Inns* is dismissed for failure to plead fraud with particularity for the same reason it was dismissed above in *Lenox Towers.* The Southern Inns PPM here contained the same caveats and warnings. It also disclosed the possibility that not all partnership units might sell: It stated that the anticipated capital contributions "will be $12,871,147 if all the interests are sold." Southern Inns PPM at 18. Investors were twice informed that the Partnership might have to obtain additional loans, including loans from outside lenders, if current financing proved insufficient. *See* Southern Inns PPM at 14 & 19. Without alleging more facts which could raise an inference of material misstatements or omissions, let alone *scienter,* projections of this nature are not actionable in either *Southern Inns* or *Lenox Towers.*

### C. *The Southern Inns Plaintiffs' § 10(b) Claims are Dismissed With Prejudice*

In light of the fact that the Complaint in *Southern Inns* has been amended three times, the Moving Defendants' Global Motion II made pursuant to the Rule 9(b), Fed. R.Civ.P., is granted and the § 10(b) claims of the Florida Plaintiffs and the Illinois Plaintiff as set forth in the Plaintiffs' Third Amended Complaint are dismissed with prejudice.

For the reasons set forth above, the Moving Defendants' Global Motion II is granted and the §§ 10(b) and 12(2) claims in *Hunter Publishing* and *Lenox Towers* are dismissed with prejudice as are the § 10(b) claims of the Florida Plaintiffs and the Illinois Plaintiff in *Southern Inns.* Finally, the *Lenox Towers* Plaintiffs' Rule 12(b)(6) motion is granted

and the counterclaims of the *Lenox Towers* Defendants are dismissed with prejudice.

### *Conclusion*

For the foregoing reasons, Global Motion I is granted in part and denied in part, and Global Motion II is granted. Therefore, the causes of action are dismissed as set forth above.

The parties are hereby directed to attend a pre-trial conference that is to be scheduled at their earliest convenience after January 19, 1993.

It is so ordered.